STATE of Arkansas *v.* Daniel SHEPHERD and Michael Torok

CR 90-67                                798 S.W.2d 45

Supreme Court of Arkansas
Opinion delivered October 29, 1990

*Steve Clark*, Att'y Gen., by: *Clint Miller*, Asst. Att'y Gen., for appellant.

*Mashburn & Taylor*, by: *W.H. Taylor*; and *Vowell & Atchley*, *P.A.*, by: *Steven E. Vowell*, for appellee Daniel Shepherd.

DAVID NEWBERN, Justice. This is an appeal by the state of an order in which the court suppressed the use of evidence. The appeal is interlocutory. *See* Rules of the Arkansas Supreme Court and Court of Appeals 29(1)(k); Ark. R. Crim. P. 36.10(a). The evidence in question was to have been used in the trial of the appellants, Daniel Shepherd and Michael Torok, for manufacture and possession of controlled substances with intent to deliver. We hold the trial court properly concluded that the prosecutor's subpoena power was improperly used to obtain the evidence, and we agree with the court's ruling that the evidence should be excluded.

On Nov. 10, 1988, State Police Sergeant Rodney Combs received information that an illegal drug operation was going on at #5 Avo in Eureka Springs. Sergeant Combs discussed the information with the deputy prosecutor, and it was decided they did not have enough information for search or arrest.

Four days later Sergeant Combs received another call about #5 Avo. He went to the prosecutor's office and while there he called an informant, Mr. Sparks, who lived near #5 Avo. Mr. Sparks told Combs that several people had been at #5 Avo that morning, that he smelled what he believed was marijuana in the area, and that the police had better hurry up and do something as it looked like the drug operation was moving or closing down.

Sergeant Combs discussed the situation with the deputy prosecutor, and it was decided they still did not have probable cause for a search warrant. Combs testified that at that point they had three options. The option of doing nothing and waiting to see what happened was rejected as he felt there was a large scale drug

operation going on and something "needed to be done about it quickly." The option of just walking on the premises was rejected because Combs thought Shepherd, whose rental property it was, might just refuse to talk to him. Combs testified the third option was chosen, and that was to "set up a situation whereby we could observe what was going on at #5 Avo in the hopes of getting enough probable cause to get a search warrant . . . what we wanted to do was to get some actual observations to see if — well, to kick the hornet's nest, so to speak."

Sergeant Combs, apparently in conjunction with the deputy prosecutor, decided that a prosecutor's subpoena was the "way to do it," and apparently at Combs's request, one was issued. Combs testified this was chosen as the way to "kick the hornet's nest" because, "I wanted to have — well, a little more legality as to what I was doing. We do a lot of ruses and that sort of thing, but in this case I wanted to be as legal as I could possibly be." It was, however, also decided that Combs would not serve the subpoena himself; rather the chief deputy of the sheriff's department, Lonnie Nichols, was called in on his day off to do so. Also, State Trooper Chuck Medford was called in to go with Nichols. Finally, two other officers were called in to go along and observe what transpired. One of the officers carried along a video-tape camera.

The five officers met at a steakhouse in Eureka Springs to organize, what Officer Combs termed, the "raid." Combs was in charge of the operation. The officers intended to serve the subpoena at Shepherd's residence at #1 Emporium. Trooper Medford was present, as he was the only one who knew where either of these houses were. Two of the officers set up an observation post so they could see what happened at both houses after the subpoena was served. The houses are fairly close to one another.

While the officers were on their way to #1 Emporium to serve the subpoena, Mr. Sparks, the informant, flagged down officers Medford, Nichols, and Combs. Sparks told the officers "they're over at #5 Avo." Combs then got out of the car and entered Spark's house to watch from Spark's rear window what transpired at the Avo Street address. Nichols and Medford went on up the street and parked approximately 50 feet from the house.

The officers testified they could smell marijuana when they

got out of the car and the smell got stronger as they approached the house. As they were walking up the drive to the house, Shepherd came out and met them. Nichols testified that they were met approximately 100 to 150 feet from the house. Medford stated it was much closer than that. While Nichols served the subpoena on Shepherd, Medford looked around. When Medford looked into the garage through the door, which was either partially or fully open (testimony is conflicting on the point), he could see bright light coming through an open door in back of the garage and also what he believed to be "stripped" marijuana plant stalks and green leafy matter. The "stalks" turned out to be tomato stakes and not the stripped marijuana stalks the officers imagined them to be.

When Nichols told Shepherd that they could smell marijuana, Medford stated "well there it is." About this time, Torok came out of the garage. Nichols looked at what Medford was indicating he believed to be marijuana plant remains and then placed both defendants under arrest.

Medford went back to get Combs who met him just down the street from the house. Medford told Combs that they "had them" and that they "could see it." Both defendants signed forms acknowledging their *Miranda* rights, and Shepherd consented to a search of the property. A search of the house at #5 Avo turned up a large quantity of fresh marijuana. Based on the results of this search, a warrant to search the house at #1 Emporium was obtained. In that search more growing marijuana was found as well as a safe which upon opening was found to contain 120 grams of cocaine.

Further testimony at the suppression hearing indicated that earlier in the day the Eureka Springs Police Department had called the city water department and told them they needed to go out to #5 Avo to check on a water leak. The people who went out determined there was no leak. The head of the water department testified it was unusual for the police to call and report a water leak and request they go check it out during the water department's normal office hours. He also felt it was unusual that the police indicated they wanted it checked because several cars were at the house. Finally, he stated the police told him that they were keeping an eye on the place and that something was going on up

there.

Officer Nichols also testified that the serving of the subpoena had a dual purpose. The first was to enable the police to talk with Shepherd. The second was to enable them to get on the property to "look around." Combs said it was to "kick the hornet's nest" and see what would happen. Further testimony indicated that the normal method of serving a subpoena was to call the person on the phone or just to send out any available deputy. It was unusual to call in Nichols on his day off. However, Nichols felt that he was called in so they would have the most experienced person in the department to serve the subpoena on the "dope grower." Finally it was indicated in the suppression hearing that it was very unusual to use five (5) officers to serve a subpoena.

Based on the testimony, and after viewing the scene where the action occurred, the trial judge ordered the evidence suppressed. The judge found that the subpoena had been issued to further a police investigation and as a pretext to allow officers onto the property and was hence invalid. In his letter opinion, which we regard as sound, the court held there had been an abuse of the prosecutor's subpoena power and that, as the subpoena was issued illegally, all the evidence discovered as a result of the service of the illegal subpoena was tainted and should be suppressed.

The contention of the state is that no Fourth or Fourteenth Amendment right of Shepherd and Torok was violated because the actions of the police officers taken pursuant to the prosecutor's subpoena did not constitute a search, and they had a right to be on Shepherd's premises in areas by which any member of the public might have approached the house. While we need not engage in a constitutional analysis in this case, we point out that a constitutional basis for upholding the suppression does exist. The state, in making the constitutional argument here, asserts that the officers entered the premises and found the evidence in "plain view." In considering the "plain view" doctrine the Supreme Court has consistently held that in order to justify a seizure of evidence found in "plain view" the officers must be legitimately on the premises. *Horton* v. *California*, 110 S.Ct. 2310 (1990). The effect of the trial court's ruling in this case, which we uphold, is to say the officers were not legitimately on the premises of #5 Avo.

Rather, they were there on the pretext of serving an illegal subpoena. The Supreme Court has made it quite clear that if the officer's presence is not legitimate, evidence found in "plain view" must be suppressed. *See also Coolidge* v. *New Hampshire*, 403 U.S. 443 (1971). Presumably based on the finding the officers were not legitimately on the premises to begin with, the trial court did not mention the Constitution in his opinion. It was simply held that the prosecutor's subpoena was an illegal pretext for the seizing and retrieval of the information sought to be suppressed. The judge wrote, in part:

> Pretext exists when the stated objective is one thing and the real objective is something else. *Folly* v. *State*, 28 Ark. App. 98, 771 S.W.2d 306 (1989); and *Richardson* v. *State*, 288 Ark. 407, 706 S.W.2d 363 (1986). It would be naive to believe the real objective of the subpoena was to compel the appearance of Shepherd at a prosecutor's hearing three days hence. If that were the case, it could have been served by telephone or in person by any deputy sheriff, but instead, the sheriff's most experienced investigator was called in from his day off. Nichols received his instructions from Combs and testified that he understood, even though it was not stated, that Combs wanted him to serve the subpoena so he would be in a position to look for evidence. Combs and Nichols had worked together before. To make matters worse, the "hornet's nest" had already been kicked that day when the Eureka Springs Police Department sent the water department to #5 Avo to check on a nonexistent water leak. The subpoena's real objective was to gather evidence for a search warrant or an arrest on November 14. Combs wanted something done that day.

While we and our court of appeals have addressed problems arising from misuse of the prosecutor's subpoena power, we have no definitive ruling whether evidence seized as a result is to be excluded. The problem is a troublesome one. We agree with the state's point that the prosecutor and the police must work hand-in-hand in the law enforcement effort; however, we cannot allow the power of the office of prosecutor to be used in a manner not intended by the general assembly or in a way which can easily abuse citizens who may be witnesses in or objects of police

investigations.

In *Duckett* v. *State*, 268 Ark. 363, 687 S.W.2d 829 (Ark. App. 1980), the court of appeals discussed the problem at length in an opinion which condemned use of the prosecutor's subpoena for purposes of a police investigation. The opinion suggested that the problem was not a common one and surely would not reoccur. The violation did not cause reversal of the conviction because the illegal questioning of a witness did not produce any evidence which upon which the conviction was based. The point of the court of appeals' *obiter dictum* was that the prosecutor's subpoena power should not be allowed to be used by the police as a means of subverting Ark. R. Crim. P. 2.2 and 2.3 which prohibit the police from coercing the appearance of a witness at a police investigation of a crime.

In *Foster* v. *State*, 285 Ark. 363, 687 S.W.2d 829 (1985), four police officers went to the home of the appellant, Foster, and told her the prosecutor wanted to see her. She accompanied them to the police station where she was questioned by the police. Although no prosecutor's subpoena was issued in that case, we cited the *Duckett* case and noted that it was "illegal to use a prosecutor's subpoena power 'to obtain the presence of a witness for questioning by a police officer, absent the prosecutor.' " We held that, as in the *Duckett* case, the authority of a prosecutor had been unlawfully used to obtain the presence of a witness in violation of Rules 2.2 and 2.3. Because it played a substantial part in her conviction, we held Mrs. Foster's statement, taken in the illegal interview, was to be suppressed. Officer Combs' testimony "if I got a prosecutor's subpoena . . . we would get to talk to him. Otherwise he could say 'Hey, I don't want to talk to you, leave.' " which clearly indicates the subpoena here was issued contrary to the *obiter dictum* in the *Duckett* case and the holding of the *Foster* case as they pertain to Ark. R. Crim. P. 2.2 and 2.3.

In *Hamzy* v. *State*, 288 Ark. 561, 709 S.W.2d 397 (1986), we again cited the *Duckett* case for the proposition that the prosecutor's subpoena power must be used only for a prosecutor's investigation. There, the police used a subpoena signed by a prosecutor to obtain information from a telephone company. We declared that the information had been "unlawfully seized," but

we then concluded the defendants had not suffered a Fourth Amendment violation because they had no standing to claim it. The unlawful seizure had been from the telephone company rather than from them. Thus we held evidence obtained in a subsequent search based on a warrant which was obtained as a result of the seizure of the telephone company information had been improperly suppressed. Again, the misuse of the subpoena power was condemned but the conviction was affirmed because the accused had no standing to claim a constitutional violation.

■ It is clear that there was an abuse of the prosecutor's subpoena power in this case. It was used to give the officers a means not only of getting on Shepherd's property but to force Shepherd to talk to police officers. The abuse resulted in unlawful seizure of evidence which the trial court properly excluded.

■ The purpose of the exclusionary rule, first expounded by the Supreme Court in *Weeks* v. *United States*, 232 U.S. 383 (1914), is to force government officials to respect the rights of citizens. The Supreme Court wrote, "unlawful seizures . . . should find no sanction in the judgments of the courts. . . ." *Id.* at 391. As we pointed out in the *Hamzy* case, the price we pay for that protection is that prosecutions where violations have occurred become more difficult and some of the guilty remain unpunished. While we have heretofore been concerned mostly with cases involving violations of rights guaranteed by the United States Constitution, our conclusion here is that there are independent and adequate grounds in the law of Arkansas to exclude evidence seized as the result of a pretextual and unlawful use of a prosecutor's subpoena power.

Our law on the subject of unlawful pretext has developed in cases involving an arrest on one ground when the purpose was something else. See *Hines* v. *State*, 289 Ark. 50, 709 S.W.2d 65 (1986), citing *Richardson* v. *State*, 288 Ark. 407, 706 S.W.2d 363 (1986), where we stated that evidence resulting from an arrest should be excluded if the arrest would not have occurred but for the ulterior motive of the police. See also *Guzman* v. *State*, 283 Ark. 112, 672 S.W.2d 656 (1984), where we found a pretextual arrest when officers, suspecting illegal drug activity, went to the defendant's property on a pretext of searching for illegal aliens.

In this case, it is undisputed that the officers went to Shepherd's property under the pretext of serving a prosecutor's subpoena. The subpoena would not have been issued or served but for the perceived need of the police to have some "legitimacy" in their approach of Shepherd and their presence on his property. While we cannot say the evidence sought to be used against Shepherd and Torok would not have eventually been obtained by legal means, perhaps even involving some sort of ruse or charade, we can say the evidence in this instance was obtained as a result of an illegal approach, and it was properly excluded. The violation may not have been as dramatic as a pretextual arrest, but it was an even more egregious disregard of the law.

Affirmed.

HAYS, GLAZE and TURNER, JJ., dissent.

TOM GLAZE, Justice, dissenting. I dissent. The majority court claims Officer Lonnie Nichols's service of a prosecutor's subpoena on the appellee Daniel Shepherd was an egregious disregard of the law and is reason to suppress a substantial amount of fresh marijuana found in Shepherd's house. Even if one agreed that the officer's subpoena was invalid, that fact had nothing to do with whether Officers Nichols and Medford were legitimately on Shepherd's premises and positioned where they could see and smell the marijuana Shepherd and appellee Torok were manufacturing inside the house.

Shepherd and Torok were operating an elaborate and sophisticated marijuana operation. They would have gotten away with the operation except, due to a mental lapse on their part, they foolishly left their garage door open.[1] As a consequence, anyone who stood in the driveway outside the Shepherd home could easily see and smell the marijuana leaves that were on the floor of a room immediately off and in back of the garage. This room was brilliantly lighted by three quartz Halide growing lights. The room's walls were painted white, the ceiling had a shiny metallic substance and the room contained timers, transformers and air circulating equipment. In immediate view and located in the

---

[1] Undisputedly, the garage door was open. The only conflict in the officers' and appellees' testimonies was whether it was fully or partially open.

garage, appellees had a large quantity of fertilizer and farming equipment.

The trial court never addressed or questioned the officers' testimony concerning what they saw or smelled. However, because I believe what the officers could see in open view while standing on the driveway is important, I mention the details of appellees' elaborate operation merely to show that evidence was introduced which substantiated or verified the officers' testimony that they could actually smell the pungent odor of marijuana that emanated from the garage. Also, I have appended to my dissent a color photograph of what the officers could see from the outside driveway when they looked into Shepherd's garage and saw a brightly lighted room with marijuana leaves strewn on the floor.[2] The evidence also reflects that it was Torok's furtive moves inside the garage that directed the officers' attention to the open garage door and that it was only after the officer saw the marijuana-growing room that Shepherd consented to the search of his house.

In repeatedly mentioning that the officers were not legitimately on Shepherd's property, the majority opinion avoids mentioning an entire body of Fourth Amendment case law that requires a finding to the contrary. In *Katz* v. *United States*, 389 U.S. 347 (1967), the Court said:

> (T)he Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. . . . But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.

The majority court fails to address the relevant issue as to whether the officers unlawfully intruded upon Shepherd's reasonable expectation of privacy. In expectation of privacy terms, quite clearly it is not objectionable that an officer has come upon the

---

[2] Hopefully, the photograph I have appended to this dissent can be reproduced by the printer so as to show the brightly lighted growing room located at the back of the garage. As has been said, a picture is worth a thousand words, especially when trying to describe this elaborate marijuana farming operation. The officers also produced a video tape to reflect what they could see from the outside driveway.

land in the same way that any member of the public could be expected to do, as by taking the normal route of access along a walkway or driveway or onto a porch. *See* W. LaFave, *Criminal Procedure* § 3.2(c) (1984); *State* v. *Corbett*, 516 P.2d 487 (Or. Ct. App. 1973). In the case of *United States* v. *Smith*, 783 F.2d 648 (6th Cir. 1986), a police officer, acting on an informant's tip, drove into the defendant's driveway and after reaching the defendant's house, he observed a large marijuana plant growing next to it. No signs or obstacles limited the officer's access to the house and no effort had been made to screen off or enclose the area where the marijuana plants were growing. The court held the officer did not violate the defendant's right to privacy by entering the driveway and proceeding to the defendant's residence where he viewed the marijuana. *See also United States* v. *Ventling*, 678 F.2d 63 (8th Cir. 1982) (the court, finding an officer's conduct of driving into defendant's driveway where he observed tire tracks and equipment which could have been used in an unlawful activity the officer was investigating was lawful, held the defendant's asserted expectation of privacy was unreasonable).

In the present case, no evidence exists to support the proposition that Shepherd had any expectation of privacy in his driveway; therefore, when the officers made an open-view observation of the marijuana-growing room without intruding into a constitutionally protected area, there was no search and thus no violation of the fourth amendment. If Shepherd and Torok had thought to close their garage door, the officers, when positioned in Shepherd's driveway, would never have seen the marijuana and growing room inside the house and the fourth amendment would have protected Shepherd from the officers' intruding inside his house. Because Shepherd's driveway was not constitutionally protected curtilage, the officers' stated reason for going to Shepherd's house, viz., to serve a subpoena, is unimportant. In fact, the officers, with or without a subpoena, could have lawfully driven or walked up Shepherd's driveway to ask him some questions. *See also* A.R.Cr.P. Rule 2.2. Contrary to the appellee's argument, the subpoena's validity or invalidity, under these circumstances, only becomes important as to whether Shepherd was required to appear before the deputy prosecutor who issued it. While I might agree the subpoena was illegally issued, that point of law has nothing to do with whether Officers Nichols and

Medlock were lawfully on Shepherd's driveway. That is the point at which the trial judge and the majority court stray from the law.

In conclusion, I mention briefly the majority's cases and reference to the plain view doctrine. *Horton* v. *California*, 110 S.Ct. 2301 (1990), and *Coolidge* v. *New Hampshire*, 403 U.S. 443 (1971). Those case involve situations in which the police had a warrant to search a given area for specified objects and in the course of the search came across some article of incriminating character. In the situation now before us, no warrant was issued and the open view involved here involved no prior intrusion covered by the fourth amendment. *See* W. LaFave, *Search & Seizure*, § 2.2(a), at 322-78 (1987), for a full discussion concerning the difference and significance between the *Coolidge* plain view doctrine and that open view doctrine involved here, where an officer discovers an object which has been left in a "nonprotected area" or while standing in a "nonprotected area" sees an object within the defendant's premises. This latter situation (or open view observation as I have labeled it) is simply distinguished by Professor LaFave, but one major distinction is covered by his quoting Judge Moylan as follows:

> [T]he condition of inadvertence is certainly not operational. In surveying sidewalks, streets and gutters and in roaming the "open fields" (even as technical trespassers), the police would seem to be free to go on fishing expeditions or to go on planned reconnaissances . . . in such nonprotected places, whether the viewing be inadvertent or not.

W. LaFave, *Search & Seizure*, § 2.2(a), at 323.

In sum, the majority court, in citing *Horton* and *Coolidge*, merely compounds its error when suggesting these holdings in some way make unlawful the officers' presence on Shepherd's premises. The officers were legally on a "nonprotected area," the driveway, and their view of the appellees' marijuana was proper under the circumstances. Therefore, there was no seizure, and thus no violation of the fourth amendment. I submit that this court should reverse the trial court's ruling to the contrary and remand this case for trial.

HAYS and TURNER, JJ., join this dissent.