2010 Ark. 388

Brandon Eugene LACY, Appellant,

v.

STATE of Arkansas, Appellee.

No. CR 09–1340.

Supreme Court of Arkansas.

Oct. 21, 2010.

Rehearing Denied Dec. 2, 2010.

Janice Wegener Vaughn, Little Rock, for Appellant.

Eileen W. Harrison, Atty. Gen., for Appellee.

ROBERT L. BROWN, Justice.

Appellant Brandon Eugene Lacy was convicted of capital murder and aggravated robbery during a jury trial that began on April 28, 2009 and concluded on May 13, 2009. Lacy appeals the judgment against him for capital murder and aggravated robbery and the sentences of death and life, respectively. He raises multiple points on appeal. We affirm.

On August 30, 2007, Melissa Lacy (Brandon Lacy's estranged wife) and her boyfriend, David Weaver, went to visit Randy Walker at his home on Beaver Hollow Road in Garfield, Arkansas, and discovered that there had been a house fire. They entered Walker's residence and found what was later determined to be Walker's burned body in the bedroom. They called 911 and reported the fire and their finding of Walker's body. The Northeast Benton County Fire Department and the Benton County Sheriff's Department, including Investigator Greg Hines, Investigator Richard Feast, and Fire Marshall William Hanna, arrived at Walker's residence to investigate. Investigator Hines interviewed and took the statements of Melissa Lacy and David Weaver and then began a tour of the residence with Investigator Feast. Upon investigating the scene, Investigator Hines classified Walker's death as an unexplained fire death and Walker's body was sent to the State Medical Examiner for an autopsy. After investigating the scene on the night of August 30, 2007, Investigators Hines and Feast harbored some suspicion as to the cause of Walker's death, but the scene that night was determined to be a suspicious fire death and was not considered a crime scene.

Fire Marshall Hanna was also at the scene on August 30, 2007 to investigate the cause and origin of the fire. He determined that the fire originated in the bedroom and that the fire eventually self-extinguished due to lack of oxygen. Fire Marshall Hanna was able to rule out accidental causes of the fire because there was

no indication that the fire was caused by a faulty space heater or electrical wiring and because he discovered what appeared to be a melted, red plastic gas can next to the bed. He also viewed Walker's body and noticed some unusual marks or avulsions on the back of his neck.

After viewing Walker's body at the scene, Fire Marshall Hanna was suspicious that the death could have been a homicide but did not definitively reach this conclusion because of the condition of the body and the extent of the burns. Samples of burned fabric, burned debris, burned cardboard, and Walker's burned clothing were submitted to the State Crime Lab for testing. The melted plastic container found on the carpet in Walker's bedroom was also submitted to the lab for testing. The results of these tests, contained in a report issued November 20, 2007, revealed a residue of gasoline on each of these items and identified the plastic container as a red fuel container with a partially burned paper in the spout. Once Fire Marshall Hanna received these results, he concluded that the fire was caused by an ignitable liquid, gasoline, that had been poured around the area of the bed in the master bedroom.

Walker's family members, many of whom lived in Kansas, were notified of his death on August 30, 2007, by Megan Wright, Melissa Lacy's sister. Randall Walker, Randy Walker's son, Randall's two grandmothers, and his fiancee left Kansas for Arkansas early in the morning on Friday, August 31, 2007. On that same day, Randall spoke with Detective Feast of the Benton County Sheriff's Office, who told Randall that they had gotten all of the evidence from Walker's residence and that Walker's family could try to salvage what was left. Randall and his fiancee returned to Walker's residence on Saturday, September 1, 2007 with a U-haul truck and began removing some items from the residence. Several items that did not fit in the U-haul truck were moved into the garage. When Randall returned to his father's residence a few days later, there were detectives inside Walker's home who told Randall that they received new evidence and had new leads in the investigation of his father's death. Randall was not permitted to remove additional items from his father's home.

On September 2, 2007, Brandon Lacy called the Rogers Police Department and told police officers to pick him up at the Hi–D–Ho Restaurant in Rogers, Arkansas, because he had murdered someone. When the police arrived, they discovered that Lacy was intoxicated, and they arrested him for public intoxication. The Rogers Police Department contacted the Benton County Sheriff's Office to report that they had someone in custody claiming to have murdered Randy Walker. Once Lacy arrived at the Benton County Jail, Investigator Hines made the decision to wait to question him until the morning, to allow Lacy to become sober.

The next morning, September 3, 2007, after properly Mirandizing Lacy, Investigator Hines began the first of several interviews with him. During this interview, Lacy admitted that he had participated in the murder of Randy Walker. Lacy further admitted to hitting Walker over the head with a fire place poker and forcing Walker to open the safe in his bedroom. Lacy also admitted to going out to the garage, getting a gas can, and setting a fire in Walker's bedroom. Lacy repeatedly stated that he was unable to remember all of the details of that night. He informed the police officers that one of his friends was also with him that night, and that his friend had hit Walker over the head with a weight bar. In a subsequent

interview the same day, Lacy identified his friend as Brody Laswell.

Laswell was arrested and admitted to being involved in Walker's murder. Laswell admitted that he hit Walker with the weight bar, but claimed that it was only after Walker showed a gun. Laswell claimed that a struggle ensued. Laswell took the police investigators to the location where he and Lacy had disposed of the evidence from the night of the murder, including their clothes and a knife.

In later interviews, Lacy admitted to stabbing Walker in the chest with a fire place poker and slitting his throat with a knife. He said that he thought Walker was "pretty much gone" after Laswell hit him over the head with the weight bar, but he stabbed him and slit |₅his throat to make sure. Lacy admitted that he took a .22 caliber gun from Walker's residence and hid it at his cousin's house.

Dr. Frank Peretti, the associate medical examiner, determined that Walker's causes of death were blunt force trauma to both the head and torso, stabbing wounds to the chest, and cutting wounds to the neck. Krista Hall, a serologist at the State Crime Lab, identified Walker's blood on both Lacy's and Laswell's shoes.

Lacy was charged with premeditated capital murder, felony capital murder, and aggravated robbery. Following the guilt phase of the trial, he was convicted by a jury of capital murder and aggravated robbery. Following the sentencing phase of the trial, he was sentenced to death and life imprisonment, as already stated in this opinion. It is from these convictions that he brings this appeal.

## I. *Sufficiency of the Evidence*

Although in his brief on appeal, Lacy challenges the circuit judge's denial of his motion for directed verdict as his last point on appeal, this court determines challenges to the sufficiency of the evidence before addressing other points on appeal due to double-jeopardy concerns. *See Hunter v. State*, 330 Ark. 198, 201, 952 S.W.2d 145, 146 (1997).

The issue of sufficient evidence is preserved by a motion for directed verdict, and this court's standard of review for such motions is well settled:

> On appeal, we treat a motion for directed verdict as a challenge to the sufficiency of the evidence. *See Johnson v. State*, 375 Ark. 462, 291 S.W.3d 581 (2009). We will affirm the circuit court's denial of a motion for directed verdict if there is substantial evidence, either direct or circumstantial, to support the jury's verdict. *See id.* This |₆court has repeatedly defined substantial evidence as "evidence forceful enough to compel a conclusion one way or the other beyond suspicion or conjecture." *Id.* (quoting *Hoyle v. State*, 371 Ark. 495, 501, 268 S.W.3d 313, 318 (2007)). Furthermore, this court views the evidence in the light most favorable to the verdict, and only evidence supporting the verdict will be considered. *See id.*

*Page v. State*, 2009 Ark. 112, at 6, 313 S.W.3d 7, 10 (2009). In order for circumstantial evidence to be sufficient, it must exclude every other reasonable hypothesis consistent with innocence. *See Carter v. State*, 324 Ark. 395, 398, 921 S.W.2d 924, 925 (1996). That determination is a question of fact for the fact finder to decide. *Id.*

Credibility of the witnesses is always an issue for the fact-finder to resolve and not this court. *See Baughman v. State*, 353 Ark. 1, 5, 110 S.W.3d 740, 743 (2003). The trier of fact is free to believe all or part of any witness's testimony and may resolve all questions of conflicting testimony and inconsistent evidence. *Id.*

Unless the evidence does not meet the required standards, leaving the jury to speculate and conjecture in reaching its verdict, the jury may choose to believe the State's account of facts rather than the defendant's. *Id.* at 6, 110 S.W.3d at 743.

In the instant case, as noted previously, Lacy was charged with capital murder and aggravated robbery. "A person commits robbery if, with the purpose of committing a felony or misdemeanor theft . . . the person employs or threatens to immediately employ physical force upon another person." Ark.Code Ann. § 5–12–102(a) (Repl.2006). A person commits aggravated robbery if he commits robbery as defined above and inflicts or attempts to inflict death or serious physical injury upon another person. Ark.Code Ann. § 5–12–103(a)(3) (Repl.2006). A person commits capital murder if, acting alone or with one or more other persons, the person commits aggravated robbery and in the course of or in furtherance of the aggravated robbery, the person or his accomplice causes the death of a person under circumstances manifesting extreme indifference to the value of human life. Ark. Code Ann. § 5–10–101(a)(1) (Supp.2007).

Lacy contends that the circuit judge erred in denying his motion for directed verdict because the State failed to prove (1) that a robbery occurred; (2) that Lacy had the purpose or conscious object to commit theft; and (3) that Lacy inflicted significant injuries, in furtherance of the robbery, that resulted in Walker's death. Lacy further claims that the only evidence of a robbery presented by the State was the testimony of Lacy's cousin, Zach Fender. Lacy maintains that he told police officers that he did not take any money from Walker's wallet, that he burned the money along with the wallet, and that the only thing he took of value from Walker's residence was the gun, which was still registered to Lacy and which Walker pulled on him.

At trial, the State first presented testimony from Zach Fender that Lacy told him about what had happened the night that Walker was killed. Fender testified that Lacy and Laswell were over at Walker's house drinking and visiting and that something came up which led to an argument between Laswell and Walker. Lacy, according to Fender, told him that Walker pulled a gun on Laswell and him and then Lacy hit Walker over the head with a fire poker. Lacy next told Fender that Laswell hit Walker with a weight bar, after which Walker quit moving. Lacy gave Fender a gun that he had taken from Walker's home. Lacy told Fender that the gun was his and that Lacy had sold it to Walker a few years ago. Lacy added that he and Laswell had taken a little bit of change and some money from Walker.

The State also presented testimony from Investigator Greg Hines, who at the time of Lacy's arrest, was with the Benton County Sheriff's Office. Investigator Hines testified that he interviewed Lacy the morning after Lacy called the Rogers Police Department to turn himself in. At this time in the trial, the State played for the jury the September 3rd recorded interview of Lacy conducted by Investigator Hines.[1] In that interview, Lacy admitted to going over to Walker's house around one or two o'clock in the morning on August 30, 2007, and waking Walker up. He told Investigator Hines that he did not know how all of this happened but that he did remember hitting Walker on the head with a fireplace poker. Lacy said that Walker did not fall down the first time he

---

1. The transcript of the September 3, 2007 interview was also shown to the jury for demonstration purposes but was not entered into evidence.

hit him and that Walker kept asking Lacy "why?" Lacy also stated that he made Walker go into his bedroom and open his safe but that there was nothing in the safe. Lacy revealed to Investigator Hines that he knew Walker had a safe in his bedroom because he had seen it before. Lacy also revealed that he expected to find some money or something of value in the safe. Once in the bedroom, Lacy said that Laswell hit Walker over the head with the weight bar, and after that, Walker was "pretty much done."

When asked about whether Walker had a gun, Lacy told Investigator Hines that Walker used to have a .22 that Lacy had sold him three or four years ago and that he hoped Walker still had that gun because it was still registered in Lacy's name. When asked if Walker pulled that gun on Lacy, Lacy stated that he did not see any gun; that if Walker had pulled the gun out, he probably would have shot Lacy; and that Lacy was glad a gun was not involved. Lacy also described how, after hitting Walker with the poker, he removed a fan from the living room window so he could shut the window because did not want anyone to hear Walker cry out.

Investigator Hines testified that he interviewed Lacy a second time on September 3, 2007.[2] The State played the second-recorded interview with Lacy from September 3rd for the jury. In that interview, Lacy stated that he took a gun from Walker's house and hid it in the bedroom closet at Fender's (his cousin's) house. Lacy also admitted to slitting Walker's throat with a knife, although he said that Walker was probably already "done" when he did that. Lacy further admitted to stabbing Walker in the chest with the poker. Lacy stated that he remembered removing the fireplace set from the home, including the poker and shovel, because it had evidence on it. When asked why Lacy had left out some of these details in his first interview, Lacy said that he had been trying to forget about a lot of it.

Based on the testimony and evidence offered at trial, we hold that there was substantial evidence to support the jury's verdict that Lacy committed aggravated robbery and capital murder.[3] The State offered proof of Lacy's own statements to police investigators that he hit Walker over the head with the poker and then forced him to open the safe. Lacy admitted that he knew about the safe because he had seen it before and that he expected there to be money or something of value in the safe. After discovering that there was nothing in the safe, Laswell hit Walker over the head with the weight bar. It is unclear what happened next, but Lacy admitted to stabbing Walker in the chest with the poker and slitting his throat with a knife. Lacy declared he believed Walker to be already "gone" when he did that, but he was just trying to make sure.

These statements all substantiate that the robbery and the murder took place very close in time. The evidence presented by the State was that Lacy knew about the safe, hit Walker over the head with the poker, and then forced him to open the safe. Lacy also admitted that he expected

**2.** The transcript of the second September 3, 2007 interview was also shown to the jury for demonstration purposes but was not entered into evidence.

**3.** Though charged with premeditated capital murder and capital felony murder, the general verdict form used by the jury does not distinguish between the two. Our conclusion on the sufficiency point is based on the evidence submitted for capital-felony murder which we hold was clearly substantial. *See Taylor v. State*, 2010 Ark. 372, 372 S.W.3d 769 (citing *Williams v. State*, 347 Ark. 728, 67 S.W.3d 548 (2002)).

there to be money or something of value in the safe. This was all ample circumstantial proof that Lacy intended to commit a robbery. Moreover, the statements from Lacy's cousin, Fender, that Lacy took the .22 caliber gun and some money from Walker's house support the jury's conclusion that a robbery did in fact occur. The fact that a robbery did not occur until after Walker was dead is unimportant. *See Grigsby v. State*, 260 Ark. 499, 509, 542 S.W.2d 275, 281 (1976).

In sum, the evidence supports the conclusion that the death of Walker occurred during a robbery under circumstances manifesting extreme indifference to the value of human life. The additional fact that Lacy set fire to the trailer confirms that conclusion. Substantial evidence abounded, and the trial judge properly denied Lacy's motion for directed verdict.

## II. *Evidentiary Challenges*

█ It is well settled that challenges to the admissibility of evidence are left to the sound discretion of the circuit judge, and a judge's ruling on these matters will not be reversed unless there has been an abuse of discretion. *See Grant v. State*, 357 Ark. 91, 93, 161 S.W.3d 785, 786 (2004). The abuse-of-discretion standard "is a high threshold that does not simply require error in the trial court's decision, but requires that the trial court act improvidently, thoughtlessly, or without due consideration." *Id.*

Lacy claims that the circuit judge abused her discretion, and thus violated Lacy's constitutional rights to present a defense under the 5th, 6th, and 14th Amendments to the United States Constitution by prohibiting the following evidence and testimony: (1) Dr. Curtis Grundy's testimony; (2) Rebecca Chaddock's testimony; (3) the dash cam video recordings of Lacy at the Hi–D–Ho Restaurant

after he turned himself in; (4) Jeff Tillotson's testimony; (5) Margaret Brown's testimony as to the authenticity of Dr. Donnie Holden's medical records; and (6) Ramon Againeses' testimony. By excluding this testimony and evidence, Lacy asserts that the trial court thwarted his attempts to put on evidence of the following defenses: (1) that the prosecutor overcharged him; (2) that he did not have the requisite intent to commit capital murder and aggravated robbery; (3) that critical evidence had been lost or tampered with due to the law enforcement officers' failure to preserve the crime scene properly; (4) that due to chronic alcoholism and Alcohol Amnestic Disorder, he could not remember all of the events that occurred the night of the incident; (5) that Brody Laswell was the one who killed Walker, and Lacy's participation in the crime was minor; and (6) that at the time of the murder, he was acting under unusual pressures or influences. The State, in counterpoint, maintains that the circuit judge did not abuse her discretion by excluding evidence that was irrelevant, hearsay, or cumulative.

### A. Dr. Curtis Grundy

█ Dr. Curtis Grundy testified at a pre-trial hearing on Lacy's competency and in connection with a motion from the defense for the circuit judge to order the Arkansas State Hospital to treat Lacy's amnesia. He testified at the hearing that Lacy was competent to stand trial; that he had received the diagnosis of Alcoholic Amnestic Disorder from Dr. Donnie Holden in 2005; that Lacy was able to recall some of the events in question, but not all of the details; and that there was some indication that Lacy was acquiring things as memories that he was supposedly told.

A few days into trial, in response to the defense placing Dr. Grundy's name on its witness list, the State moved in limine to

exclude expert testimony regarding Lacy's intent or mental state at the time of the crime. The circuit judge ruled that any testimony by a psychologist or other expert concerning the effect of alcohol on criminal intent would be excluded, as this appeared to be an attempt to circumvent the prohibition against raising voluntary intoxication as an affirmative defense to a criminal charge.[4] Lacy posits that this ruling by the circuit judge ignores the fact that this testimony also rebuts the State's claim that Lacy was intentionally refusing to disclose the details of his involvement in the crime. The State contends, on the other hand, that the circuit judge properly excluded such testimony because the arguments advanced by Lacy were not preserved for appeal, and even if they were, the testimony was properly excluded as irrelevant and cumulative.

It is well settled that this court has precluded appellants from raising arguments on appeal that were not raised before the circuit judge because the circuit judge has not had the opportunity to rule on them. *See Callaway v. State*, 368 Ark. 412, 414, 246 S.W.3d 889, 890 (2007); *Tavron v. State*, 372 Ark. 229, 232–33, 273 S.W.3d 501, 503 (2008). Additionally, appellants are limited by the scope and nature of the arguments and objections presented at trial and may not change the grounds for an objection on appeal. *Callaway*, 368 Ark. at 414–15, 246 S.W.3d at 890.

At the pre-trial hearing where Dr. Grundy testified, Lacy was not seeking to introduce his testimony at the guilt phase of the trial. Instead, Lacy was using his testimony to persuade the judge to grant his motion to have his amnesia due to alcohol treated at the state hospital. This motion was denied by the court. Further, when the circuit judge granted the State's motion to exclude expert testimony concerning the effect of alcohol on criminal intent, the defense counsel made no objections or arguments in opposition to this. Defense counsel merely stated that the motion was filed the morning of the hearing and that the defense was not able to prepare for the hearing. Finally, Lacy attempts to persuade this court that the argument in question, that Dr. Grundy's testimony would rebut the State's assertion that Lacy was intentionally failing to disclose details, was in fact raised during a conference with the trial judge held during a recess in the trial and outside of the presence of the jury concerning the admissibility of Dr. Holden's medical records referencing the Alcohol Amnestic Disorder.

Lacy is correct that this argument concerning Lacy's failure to disclose was raised during that conference in relation to the admissibility of Dr. Holden's records, but it was not raised in connection with Dr. Grundy's testimony. In fact, Dr. Grundy was not even mentioned at all during this discussion. Because the defense did not raise this argument in connection with Dr. Grundy's testimony or in response to the State's motion to exclude such evidence, Lacy has failed to preserve this issue for appeal, and we will not consider it. *See Callaway*, 368 Ark. at 414–15, 246 S.W.3d at 890.

B. Rebecca Chaddock

Lacy also sought to introduce testimony from Rebecca Chaddock at both the guilt and sentencing phases of the

---

4. Although once permitted to be raised as a defense, this court has consistently held in recent years that voluntary intoxication is no longer a defense in criminal prosecutions. *See, e.g., White v. State*, 290 Ark. 130, 717 S.W.2d 784 (1986); *Cox v. State*, 305 Ark. 244, 808 S.W.2d 306 (1991).

trial. Chaddock, according to defense counsel, would have testified that while she was incarcerated in the Benton County jail, Laswell sent her notes in which he told her that the altercation started after Lacy and Walker got into a fight and that Walker pulled a gun on them. She further said that Laswell "was the one that beat Walker down." The circuit judge concluded that Chaddock's statement qualified as hearsay but did not fit within the hearsay exception of a statement against interest due to the lack of corroborating circumstances which would support the trustworthiness of the statement.

Lacy now asserts that the circuit judge wrongly based her ruling on the lack of corroboration of the events surrounding the receipt of the evidence rather than on the corroboration of the statement itself. In response, the State argues that the statement-against-interest-hearsay exception did not apply because Laswell's statement did nothing to exculpate the accused, as is required.

The State is correct. Arkansas Rule of Evidence 804(b)(3) reads as follows:

*Statement Against Interest.* A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability ... that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offering to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement. A statement or a confession offered against the accused in a criminal case, made by a codefendant or other person implicating both himself and the accused, is not within this exception.

It is clear from this rule that to be admissible, a statement against interest must expose the declarant to criminal liability as well as exculpate the accused. *See also Branstetter v. State,* 346 Ark. 62, 75, 57 S.W.3d 105, 114–15 (2001). Here, the statement made by Laswell to Chaddock does nothing to exculpate Lacy. All the statement says is that Laswell "beat Walker down." Laswell never says anything about who hit Walker over the head with the fire poker, who stabbed him in the chest, who slit his throat, and who burned down the trailer. These are all things to which Lacy has admitted. Further, Lacy told police officers and his cousin, Fender, that Laswell hit Walker over the head with a weight bar. This statement corroborates Lacy's story but in no way exculpates him. Because Laswell's statements do not fit within the clear wording of the statement-against-interest exception to the hearsay rule, the circuit judge did not abuse her discretion in excluding this testimony.

### C. Dash Camera Recordings

Lacy sought to introduce the dash-camera-video recordings from Officer Leslie's and Officer Wiens's vehicles depicting the encounter at the Hi–D–Ho Restaurant. They were the first police officers who responded to the Hi–D–Ho Restaurant after Lacy called the Rogers Police Department to turn himself in. The defense argued at trial that these videos were admissible under Arkansas Rules of Evidence 803(3) and 803(4), the hearsay exceptions for then existing mental, emotional, or physical condition, and for statements for purposes of medical diagnosis or treatment, respectively. The circuit judge, however, found that these videos were not statements made by a party opponent and asked defense counsel if he had any case law to support his arguments that they fell

within the relied-upon exceptions, to which he responded negatively. The circuit judge ruled, accordingly, that the videos were inadmissible.

On appeal, Lacy now contends that the circuit judge erred in excluding these videos because they were not being offered for the truth of the matter asserted, as required by Arkansas Rule of Evidence 801(c), but instead were offered to show Lacy's demeanor, tone, and mental state. However, Lacy again does not offer any case law to support this argument.

█ As already set out in this opinion, appellants are precluded from raising arguments on appeal that were not raised before the trial court. *Callaway*, 368 Ark. at 414, 246 S.W.3d at 890. Further, this court will not consider conclusory arguments with no supporting authority. *See Zachary v. State*, 358 Ark. 174, 176, 188 S.W.3d 917, 919 (2004). Lacy's counsel manifestly did not argue before the circuit judge that these videos were not hearsay because they were not being offered for the truth of the matter asserted. The only statement made by defense counsel at trial was that the videos fit within either the hearsay exception for then existing mental condition or statements made for the purpose of medical diagnosis or treatment. Moreover, Lacy did not offer any supporting case law or authority, here or before the trial court, for his contention that these video tapes are admissible under either relied-upon exception to the hearsay rule. Because Lacy did not make the truth-of-the-matter-asserted argument before the circuit judge and because he offers no support for his general argument that the videos are admissible under an exception to the hearsay rule, we will not consider the argument on appeal.

### D. Jeff Tillotson

█ Lacy attempted to offer the testimony of Jeff Tillotson, an apparent ac-

quaintance of both Lacy and Laswell, at trial. Tillotson, according to defense counsel, would have testified to statements made by Laswell that Walker was the first aggressor in the fight and that he pulled a gun on Lacy and Laswell. The day that Tillotson was supposed to appear in court on a subpoena to testify at trial, he was too intoxicated to do so and failed to appear. Tillotson, in addition, had made a prior conflicting statement under oath to the prosecution. He had said that Laswell had told him that he did something bad but made no reference to Walker's pulling a gun or being the first aggressor.

Defense counsel requested a short delay at trial after Tillotson failed to appear so that Tillotson could sober up and be called to give his testimony before the court. The circuit judge found that the defense counsel's proffer of Tillotson's testimony was moot because Tillotson was unable to take the witness stand. Further, the circuit judge ruled that Tillotson's testimony was an attempt to introduce Laswell's statements through Tillotson without giving the State the opportunity to cross examine Laswell. Therefore, the circuit judge refused to grant the request and Tillotson did not testify.

Lacy does not explain on appeal why or how the circuit judge abused her discretion in refusing to allow Tillotson to testify. Furthermore, defense counsel made no argument at the trial or on appeal addressing why Tillotson's testimony would have been admissible under any exception to the hearsay rule. The only arguments presented by Lacy on appeal are that this evidence was probative as to whether the victim was the first aggressor and whether Lacy went to Walker's house to rob him, as well as being probative as mitigating evidence that Lacy was a minor participant and was remorseful. These arguments are

supported by no authority as to how the circuit judge abused her discretion. Lacy does make a passing reference to Lacy's right to present a defense pursuant to the 5th, 6th, and 14th Amendments to the United States Constitution. This court, however, will not consider conclusory arguments with no supporting authority. *See Zachary*, 358 Ark. at 176, 188 S.W.3d at 919. Accordingly, we will not address the merits of Lacy's argument concerning the admissibility of Tillotson's testimony.

### E. Margaret Brown

██ Lacy attempted at trial to introduce testimony from Margaret Brown, the records keeper at Vista Health, a psychiatric hospital in Fayetteville that provides inpatient and outpatient mental health services. Brown, according to defense counsel, would have authenticated the records of the psychiatric evaluation and diagnosis of Lacy by Dr. Donnie Holden. Dr. Holden diagnosed Lacy with Alcoholic Amnestic Disorder in 2005 and received a subpoena on April 6, 2009 to testify at Lacy's trial. In a letter dated April 15, 2009, Dr. Holden indicated that he would be unavailable to testify at trial because he had been ordered to active duty in Iraq by the U.S. Army. The circuit judge concluded that although these records were records regularly kept in the course of business activity, this testimony and the records were not admissible because defense counsel had failed to take adequate steps to secure Dr. Holden for testimony or inform the court that he was not available. The judge also ruled the records inadmissible because the information that the medical records would reveal was cumulative in that ample evidence had already been introduced concerning Lacy's alcohol addiction and abuse.

The question before this court on appeal is whether the circuit judge abused her discretion by excluding this evidence. Arkansas Rule of Evidence 803(6) reads as follows:

(6) Records of Regularly Conducted Business Activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

At trial, Brown testified that she is the records keeper at Vista Health and that these records are kept during the course of regular business activity. She also testified that she did not participate in the creation of these records, that she had no knowledge of what might support the basis for the diagnosis contained in the records, and that her job was to document what the physician documented. Regardless of whether these records were kept pursuant to regularly conducted business activity, the circuit judge excluded the evidence of Dr. Holden's medical records, after finding that the evidence sought from those medical records (Dr. Holden's 2005 diagnosis of Lacy with Alcohol Amnestic Disorder) was cumulative. Arkansas Rule of Evidence 403 allows evidence, even though it is relevant, to be excluded because of its cumulative effect.

The following people testified at trial as to Lacy's alcohol abuse or his intoxicated state: his cousin, Fender; Lacy himself in his statements to Investigator Hines; his uncle; his grandmother; three police offi-

cers; and his stepfather. There was additional evidence introduced that Lacy had been admitted to Decision Point, a recovery center for alcohol and drug treatment in Bentonville, and a second center for rehabilitation within the last year.

Based on this evidence, Lacy clearly abused alcohol and was drinking the night of the murder. Moreover, the circuit judge had already ruled that alcohol abuse could not be used as a defense to a criminal charge. We hold that the circuit judge did not abuse her discretion by excluding the evidence of these records on the basis of its cumulative effect.

### F. Ramon Againeses

Lacy attempted to introduce testimony from Ramon Againeses during the sentencing phase of the trial. Ramon Againeses was married to Virginia Lacy, Lacy's aunt. Againeses was convicted of molesting his daughters, Jennifer Hubbard and her sister Theresa. About seventeen to eighteen years ago, prior to Againeses' arrest, Jennifer and her sister Theresa were removed from their parents' home and placed with the Arkansas Department of Human Services (DHS). Jennifer and Theresa told DHS caseworkers that Lacy had molested them. An investigation was conducted, but Lacy was never charged with molesting Jennifer and Theresa. Againeses was later convicted and sentenced to prison for molesting his daughters.

The defense counsel expected Againeses to testify that he had pressured his daughters into blaming Lacy for the molestation. Yet, when Againeses was brought into court to proffer this testimony, he told the circuit judge that he did not tell his girls to blame anything on Lacy. He further claimed that he did not know that Lacy was investigated for molesting his daughters. The court ruled that the defense could not introduce this evidence because it was not relevant.

Lacy argues that by excluding Againeses's testimony, he was not allowed to present mitigating evidence and that the court erred in excluding this evidence because the rules of evidence do not apply to the presentation of mitigating circumstances. While Lacy is correct that the Rules of Evidence are inapplicable to mitigating evidence under Arkansas Code Annotated section 5–4–602(4)(B)(i), the mitigating circumstances must still be relevant to the issue of punishment or to the defendant's character, background, or history. *See* Ark.Code Ann. § 5–4–602(4)(B)(ii).

We conclude that the circuit judge did not err in deeming that this testimony not to be relevant. Againeses was not testifying to anything relating to Lacy's character or background. In fact, he had nothing to say about Lacy. He merely denied forcing his daughters to accuse Lacy of molesting them and denied having any knowledge that Lacy was investigated in connection with the molestation. Moreover, Lacy presented the mitigating testimony of his cousin, Jennifer Hubbard, who presented the exact testimony that Lacy was attempting to elicit from Againeses.[5] The circuit judge did not abuse her discretion by excluding Againeses' testimony.

### III. *Brady Violations*

Lacy next contends that the prosecution repeatedly failed to disclose poten-

---

5. Jennifer Hubbard testified at the sentencing phase that her father, Ramon Againeses, told her sister Theresa and her to accuse Lacy, their cousin, of molesting them. She also testified that this was a lie and that Lacy understood that she was pressured by her father into accusing him. She further testified that Lacy helped her deal with her pain and the difficult times after it was revealed that her father was the one who molested her.

tially exculpatory evidence and impeachment evidence throughout the discovery process and the trial. He points to several pieces of evidence that the prosecution failed to turn over to the defense, including: (1) a video interview with Jeff Tillotson in which Tillotson professed to know information concerning the Walker murder after speaking with Laswell; (2) reports from a dive-team that recovered the fire place tools from the lake; (3) recorded interviews with Melissa Lacy and David Weaver, the two people who discovered Walker's body; (4) the log of those at the crime scene on the day the fire was reported; (5) three photographs taken by Fire Marshall Hanna at the crime scene; (6) a complete audio tape of Officer Wien's interaction with Lacy the day he turned himself in; (7) criminal histories on Jackie Amos (Walker's ex-wife) and Randall Walker, Jr. (Walker's son); (8) victim-impact letters that were read to the jury during the sentencing phase; and (9) the names of three witnesses that were not on the State's sentencing witness list.

Lacy maintains that the cumulative effect of these violations prejudiced him because had the evidence been disclosed, there was a reasonable probability that the result of the trial would have been different. The State argues that Lacy has failed to show that he has been so prejudiced by these alleged violations that they raised a reasonable probability that the outcome of the trial would have been different. The State also argues that even if these alleged errors occurred, they were harmless in light of the overwhelming evidence presented of Lacy's guilt.

The United States Supreme Court has held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The Court later defined the test for material evidence in the context of a *Brady* violation as being "... if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would be different." *Strickler v. Greene,* 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). *See also Smith v. State,* 354 Ark. 226, 250, 118 S.W.3d 542, 556 (2003) (stating that prejudice can be demonstrated where there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different).

The Court in *Strickler* set out three components for a *Brady* violation: (1) the evidence must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the state, either willfully or inadvertently; and (3) prejudice must have ensued. 527 U.S. at 281–82, 119 S.Ct. 1936. This court has recognized that the reasonable-probability standard should be applied " 'collectively, not item by item,' such that the 'cumulative effect' of the suppressed evidence, and not necessarily each piece separately, must be material." *Newman v. State,* 2009 Ark. 539, 354 S.W.3d 61 (citing *Kyles v. Whitley,* 514 U.S. 419, 436–37, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)).

Rule 17.1 of the Arkansas Rules of Criminal Procedure requires the prosecuting attorney to provide to the defense counsel, upon request, certain information and material which is, or may come into, the possession, control, or knowledge of the prosecuting attorney. Ark. R.Crim. P. 17.1(a) (2009). This rule further requires the prosecutor to disclose promptly to the defense counsel "any material or information within his knowledge, posses-

sion, or control, which tends to negate the guilt of the defendant as to the offense charged or would tend to reduce the punishment therefor." Ark. R.Crim. P. 17.1(d) (2009). The prosecutor has a duty to learn of any favorable information known by others acting on the government's behalf, including the police. *See Newman*, 2009 Ark. 539, 354 S.W.3d 61 (citing *Strickler*, 527 U.S. at 281, 119 S.Ct. 1936). This court has said that "the key in determining if a reversible discovery violation exists is whether the appellant was prejudiced by the prosecutor's failure to disclose." *Bray v. State*, 322 Ark. 178, 180, 908 S.W.2d 88, 89 (1995). The burden is on the appellant to prove that the discovery violations were sufficient to undermine the confidence in the outcome of the trial. *Id.* Even if a discovery violation has occurred, this court will not reverse, if the error is harmless. *See, e.g., Mosley v. State*, 323 Ark. 244, 252, 914 S.W.2d 731, 735 (1996).

The principal piece of evidence, in this court's opinion, that the prosecution failed to turn over to defense counsel that could have constituted a *Brady* violation was the audio recording of the telephone interview with Jeff Tillotson. Tillotson had apparently called the Benton County Sheriff's Office, intoxicated, about a week after Lacy's arrest and spoke with Investigator Hines.[6] During this conversation, Tillotson claimed that Laswell had told him that Walker had pulled a gun on Lacy and Laswell, which is why Laswell hit Walker over the head with the weight bar. In a later interview conducted by defense counsel after receiving this recording and before the trial, Tillotson also made statements alleging that Laswell had possibly

indicated that Walker was the initial aggressor. The defense counsel argued that this information was valuable to Lacy's trial preparation because he could have possibly pursued a defense that Lacy was not the initial aggressor. At trial, the circuit judge found that the defense had failed to show prejudice because defense counsel had access to this recording before the trial and spoke with Tillotson in a sober state to determine what he had heard from Laswell.

While this recording was inadvertently withheld by the prosecutor since he did not know that Investigator Hines had spoken with Tillotson and had a recording of that conversation, we note that Tillotson had also given testimony pursuant to a prosecutor's subpoena that contradicted the statements he made in Investigator Hines's recording and those given to the defense. As already explained in this opinion, Tillotson was subpoenaed to trial and was expected to appear before the court to proffer his testimony, but apparently he was too intoxicated to do so. Defense counsel offered no reason why Tillotson's testimony should have been admitted, and the circuit judge concluded that it seemed only to be a device for getting Laswell's testimony into evidence without giving the State the opportunity to cross-examine him. Lacy did not offer an adequate reason or cite authority supporting how the circuit judge abused her discretion in excluding Tillotson's proffered testimony. Furthermore, other testimony was presented to the jury, including Fender's, that Walker drew a gun and pointed it at Lacy and Laswell, and, thus, was the first aggressor. We find that the requisite

---

**6.** Investigator Hines testified that he recorded his conversation with Tillotson but that this recording was not turned over to the prosecutor until after Hines left the Benton County Sheriff's Office in March of 2009. Investigator Hines also testified that he had not turned it over because he did not consider Tillotson's testimony relevant since he did not believe Tillotson had any new information.

element of prejudice is lacking on this point.

With regard to the remainder of the evidence, which allegedly, when accumulated, constituted a *Brady* violation, Lacy has not adequately shown that he was prejudiced by the State's failure to disclose, such that there is a reasonable probability, that had the evidence been disclosed, the outcome of the trial would have been different. As to some of the asserted evidence, like the complete audio recording of Officer Wien's interaction with Lacy, Lacy has failed to show that the evidence was favorable and exculpatory to him. As for the photographs and the crime scene log, Lacy claims that this information would have supported his argument that the police officers failed to secure the crime scene adequately and that evidence was lost. But, a general argument that the police failed to secure the crime scene adequately, when viewed in light of the overwhelming amount of evidence of Lacy's guilt, including his statements to police officers, his stepfather, and his cousin, certainly would not have had a significant impact on the outcome of the trial. Hence, there was an insufficient showing of prejudice.

As for the criminal histories of two witnesses, Lacy argues that these criminal histories could have been used to impeach the witnesses and undermine their credibility. Yet, as was the case with the photographs and crime-scene log, Lacy has failed to show that by impeaching two witnesses, the outcome of the trial would

have been different. In short, we hold that these asserted discovery violations did not prejudice Lacy to such an extent that they would have changed the outcome of the trial.

### IV. *Prosecutorial Abuse*

Lacy contends that the circuit judge erred in failing to conclude that the prosecutor abused his subpoena power. At trial, while the prosecutor was questioning Douglas Barnhill, Lacy's stepfather, concerning statements made by Lacy after he admitted to participating in Walker's murder, the prosecutor brought up the fact that Barnhill gave a statement on September 10, 2007, under oath, pursuant to a prosecutor's subpoena.[7] The defense counsel objected, arguing that the prosecutor abused this power when Barnhill was sworn in by a deputy prosecutor, but then essentially was only questioned by Investigator Hines. The circuit judge overruled defense counsel's objection.

On appeal, Lacy maintains that the prosecutor misused the subpoena power by allowing the police officer to do all the questioning for the purposes of a police investigation. Lacy further argues that the subsequent testimony that was given after defense counsel's objection was overruled was prejudicial to Lacy because it was used to persuade the jury that Lacy only turned himself in after his stepfather threatened to turn him in. In response, the State maintains that there is nothing that requires questions asked pursuant to

---

7. The trial testimony was as follows:

PROSECUTOR: Now, Mr. Barnhill, back on that September 10th of 2007 day you were sworn in?

BARNHILL: (nodding affirmatively)

PROSECUTOR: You knew you were by giving a statement under oath?

BARNHILL: Yes.

PROSECUTOR: And you did, in fact, say in that statement that I said to Brandon you've got very few minutes before I get on the phone and call 911, then you quoted him as saying you're not going to turn me in, then you said yes, I am going to turn you in. If you don't turn yourself in, I will turn you in. Now, you did say that to us under oath.

BARNHILL: Okay, then I said that.

a prosecutor's subpoena to be asked only by the prosecutor, if the prosecutor is present. The State asserts that this was a joint investigation between the prosecutor and law enforcement, and that the prosecutor complied with the statute because he administered the oath and was present throughout the entire proceeding.

The apposite statute allows prosecuting attorneys and their deputies to "issue subpoenas in all criminal matters they are investigating and may administer oaths for the purpose of taking the testimony of witnesses subpoenaed before them." Ark. Code Ann. § 16–43–212. In describing the prosecutor's subpoena power, this court has said:

> It was designed to take the place of questioning by a grand jury. The emergency clause to the statute states that it was enacted to enable prosecutors to 'properly prepare criminal cases.' The prosecutor may use the subpoena power to investigate and prepare for trial as long as the power is not abused. However, we will reverse a case in which a prosecutor abuses the subpoena power.

*Anderson v. State,* 357 Ark. 180, 208, 163 S.W.3d 333, 349 (2004) (citing *Echols v. State,* 326 Ark. 917, 936 S.W.2d 509 (1996) (internal citations omitted)).

This court has further said that it is illegal to use the prosecutor's subpoena power "to obtain the presence of a witness for questioning by a police officer, *absent the prosecutor." Foster v. State,* 285 Ark. 363, 367, 687 S.W.2d 829, 831 (1985) (emphasis added). The abuse of the prosecutor's subpoena power can lead to exclusion of evidence, *see State v. Shepherd,* 303 Ark. 447, 453–54, 798 S.W.2d 45, 48–49 (1990), but should not result in a reversal of conviction where the abuse does not produce any evidence upon which the conviction is based. *See Duckett v. State,* 268

Ark. 687, 690–91, 600 S.W.2d 18, 20–21 (Ark.App.1980).

It is not clear from the record in the instant case if the prosecutor asked Barnhill any questions during the interview, or if he just swore him in and remained present, albeit silent, while Investigator Hines questioned him. In *Stephens v. State,* 98 Ark. App. 196, 254 S.W.3d 1 (2007), a case cited by Lacy, the court of appeals interpreted the subpoena statute to mean that the prosecutor is the person who is supposed to take the testimony, not a police officer. The State, in contrast, argues that there is nothing in the express language of the statute prohibiting participation by a police officer.

This case is arguably different than the *Foster* case, where the witness was told the prosecutor wanted to see her but then was taken to the police station and questioned by police officers without the prosecutor present. 285 Ark. at 368, 687 S.W.2d at 831. In the case at hand, the prosecutor issued a subpoena, placed Barnhill under oath, and was present throughout the entire proceedings while Investigator Hines questioned Barnhill. We are reluctant to strike Barnhill's testimony on grounds of prosecutorial abuse under these facts and, specifically, without more information about the prosecutor's participation, or lack thereof, during the interview. Furthermore, we do not view Barnhill's testimony as integral to Lacy's conviction.

The record in this case has been reviewed for reversible error pursuant to Arkansas Supreme Court Rule 4–3(i), and none has been found. We have, in addition, conducted a mandatory review of the record as required by Rule 10(b) of the Arkansas Rules of Appellate Procedure—Criminal and considered:

(i) pursuant to Rule 4–3(h) of the Rules of the Supreme court and Ark.Code Ann. § 16–91–113(a), whether prejudicial error occurred;[8]

(ii) whether the trial court failed in its obligation to bring to the jury's attention a matter essential to its consideration of the death penalty;

(iii) whether the trial judge committed prejudicial error about which the defense had no knowledge and therefore no opportunity to object;

(iv) whether the trial court failed in its obligation to intervene without objection to correct a serious error by admonition or declaring a mistrial;

(v) whether the trial court erred in failing to take notice of an evidentiary error that affected a substantial right of the defendant;

|32(vi) whether the evidence supports the jury's finding of a statutory aggravating circumstance or circumstances; and

(vii) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.

No reversible error was determined to exist under these factors. Affirmed.

---

**8.** Rule 4–3(h) is now Rule 4–3(i) of the Rules of the Supreme Court.