

# ARKANSAS COURT OF APPEALS

DIVISION I
No. CR–15–645

| | |
|---|---|
| CESAR MICHAEL FIGUEROA<br>APPELLANT | **Opinion Delivered** January 20, 2016 |
| V. | APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT<br>[NO. CR 2013-1630-6] |
| STATE OF ARKANSAS<br>APPELLEE | HONORABLE MARK LINDSAY, JUDGE |
| | REVERSED AND REMANDED |

## RITA W. GRUBER, Judge

On September 26, 2013, Cesar Michael Figueroa was charged with two counts of rape for acts that were committed on September 2, 2012, in parking lot 14A at the University of Arkansas in Fayetteville. He was tried before a jury in the Washington County Circuit Court on March 2–3, 2015. On the second morning of trial, he moved for a mistrial on the basis of a discovery violation by the State regarding the existence of another suspect and a search warrant for that suspect's DNA. Figueroa moved alternatively for a continuance so that he could investigate the information. The circuit court denied the motions, and the defense completed presentation of its case. Figueroa was convicted on both counts and was sentenced to consecutive terms of 360 months' imprisonment in the Arkansas Department of Correction. He contends on appeal that the circuit court abused its discretion in refusing to grant his motion for a mistrial or continuance. We hold that the court abused its discretion in denying the motion for a continuance. Therefore, we reverse and remand to the circuit

court.

The prosecution's suppression of evidence favorable to an accused violates the defendant's due-process rights, where evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution. *Brady v. Maryland*, 373 U.S. 83 (1963). When the petitioner contends that material evidence was not disclosed to the defense, the petitioner must show that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler v. Greene*, 527 U.S. 263, 280 (1999). There are three elements of a true *Brady* violation: the evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching; the evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued. *Strickler*, 527 U .S. at 281–82; *Bond v. State*, 2015 Ark. 470, at 3. Impeachment evidence that is material, as well as exculpatory evidence, falls within the *Brady* rule. *Bond v. State*, 2015 Ark. 470, at 3 (citing *United States v. Bagley*, 473 U.S. 667 (1985)).

The prosecutor has a duty to learn of any favorable information known by others acting on the government's behalf, including the police, *Lacy v. State*, 2010 Ark. 388, at 25, 377 S.W.3d 227, 242 (2010), and must disclose the information in sufficient time to permit the defense to make beneficial use of it. Ark. R. Crim. P. 17.1; *Lee v. State*, 340 Ark. 504, 509, 11 S.W.3d 553, 556 (2000). When the prosecutor fails to provide information, the burden is on the defendant to show that the omission was sufficient to undermine confidence in the outcome of the trial. *Id*. at 509–10, 11 S.W.3d at 556. A "reasonable probability" is

2

a probability sufficient to undermine confidence in the outcome. *Id.* at 511, 11 S.W.3d 553, 557 (2000) (citing *United States v. Bagley*, 473 U.S. 667 (1985)). A failure to disclose may be cured by granting a continuance or recessing the trial until appellant's attorney can have an adequate interview with the witnesses. *Rychtarik v. State*, 334 Ark. 492, 500, 976 S.W.2d 374, 378 (1998).

The victim in this case went out with friends after the university's first home football game of the season, visiting crowded places along Lafayette, Gregg, Dickson, and West Streets. She decided around midnight to walk home to 623 West Maple, and she let her roommate know she was on her way home. She noticed two men in front of her and two men behind her on a bridge on Lafayette, her cut-through route to Gregg Street and the campus parking lot behind a small parking lot at their house. When she got to the campus parking lot, which she described as unlighted, she noticed "the two men" and a man behind her "in a gray sweatshirt [with] dark hair . . . wearing khakis or light-colored pants." She recounted in her testimony being attacked from behind in the darkness; being thrown to "all fours. . . hands and knees"; and fighting, flailing her arms, and screaming until she was choked and her mouth was covered. The attacker grabbed her, pushed her down, and told her to be quiet—threatening to slit her throat and shoot her. She continued to scream, never getting a good look at his face. Her panties were ripped off, her skirt was thrown up, she was pushed and pinned to the ground, and she sustained bruises and abrasions to her knees and right ankle. Her attacker raped her vaginally with his fingers and anally with his penis. When she finally cried and begged him to stop, he said, "Okay. I will." He then got up and ran away.

SLIP OPINION

The victim's roommate heard a woman screaming, "Help me. Get off of me. Get off of me. Somebody help." Grabbing a hammer, the roommate ran outside, through an opening in the bushes, and called 911. She saw "two people down in the shadows"—a girl face down and still screaming, her skirt pulled up; and a guy with dark hair and darkish skin, wearing a T-shirt and khaki shorts. She heard sirens on Maple Street approaching Lot 14; saw the guy run toward the other end of the parking lot, to Gregg Street and the railroad tracks; and recognized the victim only when she stood up, covered in blood. The roommate testified that no one else had been there during the attack. Police began arriving within a minute of the attack; they took initial statements from the victim and her roommate, secured the scene, and gathered evidence. The victim underwent a hospital rape-kit procedure and then went with her roommate to the University of Arkansas Police Department (UAPD) to give their written statements. Each described an attacker with dark hair, gray shirt, and lighter-colored pants.

Multiple items in this case were submitted to the state crime laboratory on November 4, 2012. No semen was found on any of them. On the outside of the victim's skirt was a mixture of DNA from at least three individuals; testing results were inconclusive for comparative purposes and could not be matched to Figueroa. On other items, where DNA of more than one individual or someone other than the victim was identified, the second components were too limited or inconclusive for comparative purposes. A "tape lift" from the outside of the victim's underwear that indicated a mixture of DNA was found to have been contaminated by a crime-lab staff member's DNA profile. Tape lifts of the victim's shirt

indicated the presence of more than one individual: the victim could not be excluded as a contributor to the minor component of the DNA profile, and the crime lab had no DNA at the time to compare to the major component. The laboratory's forensic analyst explained that tape lifts help identify "touch transfer type DNA" such as from skin cells, mucus, or sweat; that the State will search for a match when the lab has a DNA finding but no suspect to compare it to; and that such a match was made in this case. After matching Figueroa's oral swabs to DNA in the lab's database, the analyst was able to state within all scientific certainty that the major component of the DNA profile from tape lifts of the victim's shirt originated from Figueroa.

The State's final witness, UAPD Captain Greg Foster, testified that he was called to Lot 14A off Maple Street soon after midnight on September 2, 2012. He testified as follows about subsequent investigation of the assault. The victim's general description of her attacker—a man of average build, somewhat stocky, light-brown skinned but not necessarily Hispanic, and in his early twenties—was released to the public, and police eliminated several potential suspects over time. Foster received information in April 2013 about an individual who somewhat resembled the attacker's physical description, had "certain temperament issues," and had lived "in an area adjacent to the trail . . . off Maple Street" where the attacker was believed to have left the crime scene. Officers eventually located the suspect in DeQueen rather than in Fayetteville. They obtained a search warrant in July 2013 to collect DNA swabs from him, went to DeQueen to execute the warrant, and learned that he had fled to Oklahoma. In August 2013, Foster was notified of a CODIS hit[1] on Figueroa in the crime

---

[1]Combined DNA Index System

lab's system. No further action was taken concerning the suspect from DeQueen.

Captain Foster obtained a search warrant to obtain a sample of Figueroa's DNA for comparison with "what had come back initially from the crime lab" and "to do a positive ID of matching him exactly." Figueroa agreed to come with officers to the police department for a voluntary interview on August 26, 2013, which Foster conducted. Foster conducted the interview, obtained swabs from Figueroa's cheeks, and submitted the swabs to the crime laboratory. Figueroa admitted in the interview to drinking beer on Dickson Street one night; "hollering" at a girl, likely because of what she was wearing; coming up behind her; attacking her; and threatening her in an attempt to keep her quiet. He said that he did not "enter her." Police had not publicized that the attack came from behind; that the victim was pushed down; that the attacker threatened her about being quiet or getting hurt; or that the attacker agreed when she asked him to let her go. Defense counsel attempted to show through cross-examination of Captain Foster that before getting Figueroa to confess in the interview, Foster alluded to the attack and sexual assault and to the victim's being "let go" after she was stalked, grabbed, and followed on Dickson Street.

Figueroa's counsel made her motion for a mistrial or a continuance the second morning of trial, before proceedings resumed in open court. She informed the court that in following up on Foster's testimony,[2] she had been given additional information about the suspect and "for the first time this morning" had received a copy of the search warrant for a DNA sample of the suspect in DeQueen, Trinidad Abrego. Counsel had learned of a

---

[2]The prosecutor had been unaware of the DeQueen suspect until the testimony provided by Captain Foster on the first day of trial. Captain Foster stated in that testimony, "This is the first time I've [spoken] about this individual outside of my department."

confidential informant's telling the UAPD that Abrego said he had helped rape someone on the trail in Fayetteville. Counsel also had learned from the State that Abrego allegedly had a reputation for violence and that his DNA sample existed in DeQueen. She stated to the court,

> We spoke to the crime lab this morning, who said they are ready to run evidence software. They can run another test on the inconclusive DNA that was testified to yesterday, the outside of the skirt that had more than two profiles that were both inconclusive. They can re-analyze that mixture. The crime lab is currently awaiting instructions and also can analyze what is known as YSTR[3] for exclusion purposes.

Captain Foster's affidavit for search warrant stated that an unidentified DNA profile recovered from the victim's clothing was in the CODIS system and that Foster had been contacted by a retired Fayetteville police lieutenant, who had been contacted by an aunt of a person with "personal knowledge of a white Hispanic male known as Trinidad Abrego." The affidavit further stated

> After making contact with the Aunt I was provided several pieces of information that seemed to be related to the assault in lot 14A. At the time of the assault Mr. Abrego was residing in Chestnut Apartments. The city trail that [sic] leads north from Maple Street approximately 25 yards northeast of lot 14A, leading directly to the apartment complex. On the night of the assault, Mr. Abrego had received information his brother had been killed in gang related activity in California. Mr. Abrego was extremely angry he could not return to California and started to consume alcohol. He requested sexual relations from an individual who refused his request. Mr. Abrego left the apartment at approximately 2200 hours, stating he was going somewhere to find sex. Mr. Abrego did not return until approximately 0200 hours. When he returned he refused to discuss where he had been.

> A subject has come forward as a confidential informant (CI) who provided additional detail on Mr. Abrego. The CI stated Mr. Abrego was partial, nearly exclusive, to anal intercourse. He often used the city trail system to navigate to areas close to the University and Dickson Street. Mr. Abrego made a statement to the CI that he had helped rape a female on the trail.

---

[3]Counsel gave no further explanation of "YSTR."

The affidavit requested a DNA search warrant based on the similarity in the descriptions of Abrego and the suspect in the campus assault, Abrego's residence in the proximity of the assault, his statement to the CI, the proximity of the site of the assault and the city trail by Maple Street, and the similarity of the attack along with Abrego's preference for anal intercourse.

Counsel requested a mistrial or a continuance for time to investigate, arguing that the previously undisclosed information was exculpatory because, if investigated, it could tend to negate Figueroa's guilt. She argued that the defense had not been given the information in substantial time to make use of it and that prejudice resulted from the defense's inability to investigate Abrego and test his DNA. She asserted that some DNA had been corrupted,[4] that the defense was challenging Figueroa's confession as false, and that there was a reasonable probability of a different outcome had the defense been able to investigate the previously undisclosed information.

The circuit court denied the motion for mistrial or continuance, finding that the undisclosed evidence was not exculpatory. It reasoned that neither the victim nor her roommate had testified that two people were involved in the assault and that Figueroa's confession, with details about what happened, had made no claim that two people were involved. The court reviewed other evidence as follows:

> [T]he description given by the roommate was that of a dark skinned, dark haired man in a t-shirt and shorts. This gentleman described in the affidavit for the search warrant is . . . a tanned skinned male, possibly white. Now, I remember the testimony that the assailant . . . ran off towards the trail. . . . This occurred just off of Maple Street, and

---

[4]The State responded that the contaminated DNA was not the sample in which Figueroa's DNA was found.

the trail, let's see.  The Chestnut Apartments . . . are on . . . Poplar Street . . . to get to Poplar on the trail, you would have to go north . . . you'd cross North Street, Sycamore Street, and before you would ever get to Poplar.  . . . I don't think those facts are at issue.  . . .

I just fail to see that this is exculpatory under the evidence on the record.  . . . [N]obody knows at this time whether there's prejudice or not.  But it does not appear to me that there would be prejudice since it's not exculpatory.  Again, I rely, for the most part, on the fact that no one has claimed that there were two people involved in this occurrence, . . . and Mr. Abrego does not claim that it happened he says he helped on the trail.  This was close to the trail.  . . . But it was not on the trail.  So I do not find that the defense at this time has met the three elements of the *Brady* violation test.  I do not see that it is favorable to the accused.  . . . [T]there's a lot of apartment complexes on that trail.  There's a lot of people that live close by.  And nothing in this affidavit puts him off the trail, near the trail.  . . .  [T]he claim of the confidential informant is that he helped rape a female on the trail.  So I do not find that this is exculpatory.

The court noted that defense counsel had been surprised by this information on the previous day of trial and had attempted to impeach Foster's credibility.  The court concluded, "I do not find this information, in and of itself, impeaching.  It's the fact that she didn't have the information that she used to impeach."

Figueroa contends on appeal that the State committed a reversible discovery violation by failing to disclose exculpatory information about the suspect in DeQueen.  He asserts that the undisclosed information was material to his alleged guilt because his defense was innocence and the main evidence against him was touch DNA on the shirt of the victim, who had been in crowded areas, and his own confession, which mirrored the interviewer's explanation of the crime.  Figueroa maintains that the undisclosed information—the DNA search warrant for another suspect, the accompanying affidavit pointing to the viability of the suspect, and the untested DNA sample of this suspect—constituted exculpatory information tending to negate his guilt and, had it been properly produced, the defense could have

investigated the facts in the affidavit and tested Abrego's DNA sample, which was available for comparison to evidence from the attack. He asserts that prejudice resulted because he was not given the information in time to make use of it before trial and because, once it was discovered, he was denied a meaningful opportunity to investigate. He asserts that the DNA testing, depending on its outcome, could have been used by the defense to bolster his claim of actual innocence.

We find merit in Figueroa's arguments. The prosecutor failed to timely disclose the existence of Abrego's DNA sample so that the defense could have the state crime laboratory test it and compare it to DNA on the outside of the victim's shirt. By denying Figueroa the opportunity to investigate the information in the affidavit and the opportunity to compare the newly revealed DNA with the DNA previously collected, the court denied him the opportunity to bolster his assertion of innocence and to impeach Captain Foster's testimony. Figueroa has shown a probability that the omission of this information was sufficient to undermine confidence in the outcome of his trial. *See Lee v. State*, *supra*.

Reversed and remanded.

WHITEAKER and HOOFMAN, JJ., agree.

*Robert M. "Robby" Golden*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Ashley Driver Younger*, Ass't Att'y Gen., for appellee.