Karen R. Baker, Justice, dissenting.
I dissent from the majority's decision that this case must be reversed and remanded for the circuit court to review the DHS file to determine whether it contains information that was material to Taffner's defense. Because Taffner failed to proffer the DHS file, I would affirm the circuit court's ruling.
In Brown v. State , 368 Ark. 344, 347, 246 S.W.3d 414, 416 (2007), during cross-examination of the victim, Brown discovered that the State had a calendar where the victim and the victim's mother had set out events and dates related to the alleged crimes. Brown sought access to the calendar and the circuit court denied Brown access and ruled that calendar was work-product. On appeal, Brown asserted that the circuit court erred, but we were unable to reach the merits because Brown did not proffer the calendar. We explained,
we cannot reach the issue of whether the calendar contained work product because Brown did not proffer the calendar and make it part of the record. Where evidence is excluded by the circuit court, the party challenging that decision must make a proffer of the excluded evidence at trial so that this court can review the decision, unless the substance of the evidence is apparent from the context. Arnett v. State , 353 Ark. 165, 122 S.W.3d 484 (2003). The substance of the evidence in this case is not apparent. The evidence concerning what is written on the calendar is conflicting; however, this court cannot review a document that is not before it.
Here, as in Brown , the substance of the evidence is not apparent. Because Taffner failed to proffer the DHS file, it is not part of the record before this court for us to review.
Further, although I agree that the circuit court erred in failing to review the DHS file, there is no way for us to determine whether Taffner was prejudiced by this error, when the DHS file was not *441 proffered. Here, the substance of the evidence is not apparent and there is no way for this court to determine whether any evidence material to Taffner's defense was contained in the file. In fact, it is apparent that no exculpatory evidence could possibly be contained in the file and the only possible material evidence that could be contained in the DHS file would be impeaching. Even if impeaching evidence is contained in the file, it is clear that it would not be admissible as extrinsic evidence. Ark. R. Evid., 613(b) (2017). Because Taffner was able to ask in cross-examination if the allegations B.T. made against her biological father were true, and she admitted that the allegations were not true, Taffner was allowed to impeach B.T.'s credibility in the manner provided for by the Rules of Evidence and nothing contained in the DHS file could have been used as impeaching evidence as it would have been extrinsic evidence. Because it is not apparent that material evidence was contained in the DHS file and the file was not proffered, I would affirm the circuit court.
Josephine Linker Hart, Justice, dissenting.
Because the majority opinion declines to address an easily identifiable Brady violation, ignores an entirely unreasonable restriction of a key witness's cross-examination, and then returns this case to the trial court in a manner allowing for it to be discretely and improperly disposed of without any mechanism for appellate review, I must dissent. Each of Taffner's arguments on appeal are tailored to support the broader assertion that he did not receive a fair trial below, an assertion that is inescapably correct. The jury in this case simply was not presented with all the evidence it should have been, and we cannot afford confidence to its verdict. Taffner has already established that he has a right to a new trial, and this right does not hinge upon what the trial court represents is or is not contained in the DHS file on remand.
Background
For a full understanding of this case, it is necessary to recount several of the events that transpired below, many of which are not mentioned in the majority opinion. Before trial, Taffner filed a motion to compel the State to produce a "DHS File" containing reports from a Maltreatment Act investigation (the "Maltreatment Investigation Reports") of prior allegations of sexual abuse that one of the complaining witnesses, BT, had levied against her biological father, Chris Murray. The prosecution has access to the Maltreatment Investigation Reports pursuant to Ark. Code Ann. § 12-18-910, but a defendant cannot obtain access to those same reports without a court order so permitting. The Maltreatment Act investigation resulted in an "unsubstantiated" finding, where the burden of proof for a "true" finding was only a preponderance of the evidence. During the pretrial hearing that took place after the DHS file was delivered to the circuit court's chambers pursuant to Taffner's motion to compel, the circuit court announced that it would not even look at the DHS file or allow Taffner to see any of its contents.
The circuit court based this decision upon its purported belief that BT's prior allegations against Mr. Murray were not actually false. To support its purported belief, the circuit court relied on the past decision by the Washington County Juvenile Judge to terminate Mr. Murray's parental rights in a dependency-neglect case. This termination of parental rights ("TPR") order was based at least in part on Juvenile Judge Stacey Zimmerman's finding that BT had "disclosed sexual abuse by father." The circuit court stated *442 that it had spoken to Judge Zimmerman between the time the file was ordered to be delivered and the time the hearing began, and added that Judge Zimmerman would have accounted for the Maltreatment Act investigation's unsubstantiated finding before terminating Mr. Murray's parental rights.
In response, Taffner reiterated that the Maltreatment Act investigation, unlike the dependency-neglect case, had resulted in an "unsubstantiated" finding. Additionally, Taffner requested to present the circuit court with a report from BT's counselor, reflecting that BT had since admitted that her allegations against Mr. Murray were false. The circuit court immediately and directly cut off Taffner's request with, "No, you may not." The circuit court would then conclude the hearing by ruling that Taffner would not receive access to any of the file's contents and that the circuit court had no cause to look at the file either.
Later, on the second day of trial, after Taffner had continued to press the issue by filing a motion for an in camera determination of relevancy, the circuit court held a hearing outside the presence of the jury during which BT testified about her prior allegations against Mr. Murray. During her in camera testimony, BT admitted without qualification that her prior allegations against Mr. Murry had been false. However, the circuit court continued to deny Taffner access to any of the DHS file's contents. The circuit court then informed Taffner that he would only be permitted to ask BT three specific questions about her prior allegation on cross-examination: (1) whether she had made prior allegations of sexual abuse against her biological father, (2) when those allegations had been made, (3) whether the allegations had been untrue, and nothing more. The circuit court made it clear that "whatever the answer is, you're stuck with it," and reiterated that "[t]here will be no documentary evidence regarding these issues." When the trial resumed and defense counsel asked BT the questions permitted on cross-examination, BT offered a different response from that she had just given a few minutes prior: "Now that I know the terms they use, it is not true." Defense counsel did not ask BT any questions about the prior allegation beyond what the circuit court had permitted. Later that day, the circuit court signed an order memorializing its decision from the pretrial hearing that Taffner had failed to establish that BT's prior allegations against Mr. Murray had been untrue. The same order was filed the following morning.
With regard to the trial itself, it suffices to say that this case lacked compelling physical evidence, and that the three complaining witnesses' versions of events and credibility as a general matter were subject to impeachment. Taffner's entire theory of the case at trial was that the three complaining witnesses were telling a coordinated lie, and any ruling that inhibited Taffner's ability to cross-examine the complaining witnesses' credibility or versions of events would have been particularly impactful. The jury could not have convicted Taffner unless it believed the complaining witnesses' testimony.
The DHS File and Brady
I now turn to the DHS file and the Maltreatment Investigation Reports contained therein. The suppression of the DHS file in its entirety was a Brady violation, which warrants a new trial, not just an in camera review of the file. "Suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."
*443 Brady v. Maryland , 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). This court has observed that there are three components to a Brady violation: "(1) the evidence must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the state, either willfully or inadvertently; and (3) prejudice must have ensued." Lacy v. State , 2010 Ark. 388, at 24-25, 377 S.W.3d 227, 241 (citing Strickler v. Greene , 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) ). The remedy for the suppression of Brady material is a new trial where the suppressed evidence would have been "material" to the defendant's claim of innocence, and the evidence meets the definition of materiality "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Strickler , 527 U.S. at 281, 119 S.Ct. 1936 (emphasis added). Materiality's "reasonable probability" definition is interpreted as follows:
The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial.
Kyles v. Whitley , 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).
The majority opines that Pennsylvania v. Ritchie , 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987) controls the resolution of this case. There, the Commonwealth of Pennsylvania had charged the defendant with sexually assaulting a minor living in his home, and the defendant sought access to a state CYS file relating to an investigation of a prior allegation levied by the same complaining witness. A Pennsylvania statute provided that the CYS files were to be kept secret unless a court ordered their production, and the defendant argued that he should have access to the CYS file because it "might" contain favorable evidence. The trial court declined to review the file in its entirety, and denied the defendant access to the file. On appeal, the Ritchie Court provided a mechanism through which a trial court can determine whether certain information in the State's possession, information that is kept secret pursuant to state law, would qualify as Brady material that must be disclosed to the defense, without curtailing the State's interest in confidentiality any more than is necessary. That mechanism is an in camera review by the trial court to determine whether the information or any part of it would be "material" to the defendant's claim of innocence. The Ritchie Court held:
We find that Ritchie's interest (as well as that of the Commonwealth) in ensuring a fair trial can be protected fully by requiring that the CYS files be submitted only to the trial court for in camera review. Although this rule denies Ritchie the benefits of an "advocate's eye," we note that the trial court's discretion is not unbounded. If a defendant is aware of specific information contained in the file (e.g., the medical report), he is free to request it directly from the court, and argue in favor of its materiality. Moreover, the duty to disclose is ongoing; information that may be deemed immaterial upon original examination may become important as the proceedings progress, and the court would be obligated to release information material to the fairness of the trial.
Id. at 60, 107 S.Ct. 989.
Similar to Pennsylvania's CYS files in Ritchie , the Maltreatment Investigation Reports at question in this case are subject to an Arkansas confidentiality statute, *444 and similar to the trial court in Ritchie , the circuit court in this case declined to even conduct an in camera review of the DHS file containing the Maltreatment Investigation Reports. This is where the majority halts its analysis, concluding that this case is just like Ritchie and that we need only return it to the trial court for an in camera review of the DHS file, which will then determine whether Taffner receives a new trial.
The majority's conclusion ignores the fact that all Ritchie represents is a mechanism to facilitate due process, a mechanism that is inapplicable to the case at bar. It is important to note that, in Ritchie , the defendant had no idea whether the CYS file in question actually contained favorable evidence, only that it might. See Brief for Petitioner at 7, Pennsylvania v. Ritchie , 480 U.S. 39, 1986 WL 728024 (1987) (defense counsel arguing to trial court that "(t)here could be defense witnesses disclosed by their records here," that "(he)'d like to see the doctor's report," which he thought to be contained in the CYS file (although he had no idea what the report reflected), that "[t]here could be matters in there that could be favorable to the defendant," etc.). Indeed, the Commonwealth of Pennsylvania characterized the defendant's efforts as a "fishing expedition" in its brief. Id. at 12, 22. There is nothing in Ritchie to suggest that a defendant is not entitled to a given piece of information if he can establish its materiality independent of an in camera review, in which case a new trial is required for the nondisclosure of that piece of information. See Brady , supra (nondisclosure of material information requires a new trial). In fact, Ritchie specifically contemplates this scenario: "If a defendant is aware of specific information contained in the file (e.g., the medical report), he is free to request it directly from the court, and argue in favor of its materiality." Ritchie , 480 U.S. at 60, 107 S.Ct. 989.
This is precisely what occurred in the case before us. It is undisputed that the DHS file contained the Maltreatment Investigation Reports relating to BT's prior false allegation against her biological father, and these reports were plainly material to Taffner's claim of innocence. The juvenile judge had terminated the parental rights of Chris Murray, BT's biological father and an authority figure in her life, on the basis of BT's sexual-abuse allegations; and now Taffner, BT's adoptive father and another authority figure in her life, stands accused of BT's sexual-abuse allegations as well. The circuit court continued to deny Taffner his requested access to the Maltreatment Investigation Reports (or anything else in the DHS file) even after BT acknowledged through her in camera testimony both that she made the allegations against her biological father and that those allegations had been false.
At that point, the circuit court was inescapably apprised that the DHS file contained highly relevant impeachment evidence on BT in the form of the Maltreatment Investigation Reports. As such, there is no meaningful dispute as to whether Taffner had established for the circuit court that the DHS file contained Brady material. See United States v. Bagley , 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (disavowing any difference between exculpatory and impeachment evidence for Brady purposes); see also Youngblood v. West Virginia , 547 U.S. 867, 869, 126 S.Ct. 2188, 165 L.Ed.2d 269 (2006) ("[T]he Brady duty extends to impeachment evidence as well as exculpatory evidence."). The suppression of the Maltreatment Investigation Reports absolutely undermines confidence in the outcome of Taffner's trial, which lacked compelling physical evidence and turned upon the credibility of witness testimony. Therefore, remanding for an in camera review of the DHS file is not necessary to determine whether Taffner should receive *445 a new trial because it is already apparent that the suppression of the Maltreatment Investigation Reports constituted a Brady violation; instead, this court should hold that Taffner is entitled to a new trial.[1]
Prejudice from the Brady Violation
Justice Baker suggests in her dissent that, even if the circuit court erred in this regard, "it is apparent that no exculpatory evidence could possibly be contained in the file and the only possible material evidence that could be contained in the DHS file would be impeaching," and that any such impeachment evidence would be inadmissible pursuant to Ark. R. Evid. 613(b). With all due respect, this position is without merit, for at least four reasons.
First, this assertion confounds a constitutional due process guarantee with an evidentiary rule. The question of whether certain information qualifies as Brady material, which must be provided to the defense whenever the prosecution becomes aware of its existence, is separate and apart from the question of whether all or part of that same information would be admissible at a jury trial for one evidentiary purpose or another (e.g., using circumstances of a person's prior bad acts to show that person's motivation to lie in a given situation, using a person's prior inconsistent statements to contradict that person's testimony given at trial, etc.) or in one evidentiary form or another (e.g., a documentary exhibit, witness testimony based upon personal knowledge, etc.). Investigating a case and trying a case simply are not the same thing.
Second, Rule 613(b) only addresses the use of a witness's prior inconsistent statements. Justice Baker's position presumes (1) that the only useful thing Taffner could have gotten out of the DHS File would be prior inconsistent statements from BT, and (2) that the only way to impeach a witness is through the use of a prior inconsistent statement; both of these presumptions are incorrect. The Child Maltreatment Act's plain language shows that the DHS File would contain more than just BT's prior inconsistent statements.[2] Additionally, prior *446 inconsistent statements are just one of many ways contemplated by the rules of evidence to show that a complaining witness's allegations should not be believed. See, e.g. , Ark. R. Evid. 404(b) (permitting use of person's prior acts to show bias, motivation, knowledge, common plan, etc.); Ark. R. Evid. 608(a) (addressing use of opinions or reputation relating to a witness's character for truthfulness); see also Ritchie , 480 U.S. at 51-52, 107 S.Ct. 989 ("Had the files been disclosed, Ritchie argues that he might have been able to show that the daughter made statements to the CYS counselor that were inconsistent with her trial statements, or perhaps to reveal that the girl acted with an improper motive. Of course, the right to cross-examine includes the opportunity to show that a witness is biased , or that the testimony is exaggerated or unbelievable. ") (emphasis added).
Third, even if we were to address Taffner's cross-examination of BT about her prior allegations solely in terms of Rule 613(b)[3] , that rule allows the use of extrinsic evidence of a prior inconsistent statement if "the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon[.]" Ark. R. Evid. 613(b). In this case, BT was afforded (and took advantage of) an opportunity to explain her prior allegations, but the circuit court, as discussed in greater detail below, did not permit Taffner to conduct any meaningful cross-examination of BT's explanation. Assuming that Rule 613(b) was applicable to the questions Taffner was permitted to ask BT about her prior false allegation, the only conditions necessary for allowing the use of extrinsic evidence that were not met in this case were those which would have protected Taffner's interests, i.e., those that the circuit court ignored.
Fourth, Justice Baker presumes that the DHS File would only consist of "impeachment" evidence pertaining to BT's prior allegations against Mr. Murray, to be distinguished from any "exculpatory" evidence that would pertain directly to BT's relationship with Taffner, but this is not necessarily the case. While we know that Mr. Murray's dependency-neglect case ended with the termination of his parental rights in 2011, and we know the Maltreatment Investigation resulted in an "unsubstantiated" finding, we do not know when the Maltreatment Investigation began or ended. If Taffner's and BT's adoptive relationship began with BT coming to Taffner's home as a foster child after being removed from Mr. Murray's home (a progression *447 that is not at all uncommon in the foster care system), it is entirely possible that the Maltreatment Investigation took place after BT was already living with Taffner. Indeed, the Arkansas Court of Appeals opinion from Mr. Murray's appeal of Judge Zimmerman's TPR order reflects that one "Chris Tefner (sic)" had been serving as BT's foster father since August of 2010, and even testified at Mr. Murray's TPR hearing. Murray v. Arkansas Dept. of Human Services , 2011 Ark. App. 588, 4, 385 S.W.3d 897, 899. As such, it is entirely possible that the DHS File contains information pertaining directly to BT's relationship with Taffner.
Overall, the prejudice associated with the suppression of the DHS File in its entirety cannot be understated. This suppression did not just deprive Taffner of the file's use for purposes of Rule 613(b) or Rule 608(b). It deprived Taffner of the ability to adequately investigate and develop his claim of innocence; it violated Taffner's right to cross-examine the witnesses against him; and it deprived Taffner of the file's use for literally any evidentiary or investigative purpose whatsoever.
Impermissible Restrictions of BT's Cross-Examination
Additionally, as Justice Wynne points out in his opinion, this Brady violation was further compounded when the circuit court limited Taffner's cross-examination of BT about the prior allegation to three pretailored questions in violation of the Sixth Amendment to the United States Constitution. The Sixth Amendment guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." U.S. Const. amend. VI. "Confrontation means more than being allowed to confront the witness physically." Davis v. Alaska , 415 U.S. 308, 315, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). "The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination. The opponent demands confrontation, not for the idle purpose of gazing upon the witness, or of being gazed upon by him, but for the purpose of cross-examination, which cannot be had except by the direct and personal putting of questions and obtaining immediate answers." 5 John H. Wigmore, Evidence § 1395, at 123 (3d ed. 1940). In Davis , a burglary case in which the trial court prevented the defendant from using the fact that a witness was on juvenile probation for burglary to impeach that same witness, the Supreme Court stated:
On the basis of the limited cross-examination that was permitted, the jury might well have thought that defense counsel was engaged in a speculative and baseless line of attack on the credibility of an apparently blameless witness ... On these facts it seems clear to us that to make any such inquiry effective, defense counsel should have been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. Petitioner was thus denied the right of effective cross-examination which would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it.
415 U.S. at 318, 94 S.Ct. 1105 (emphasis added).
The excerpt from Davis above seems to be an eerily accurate characterization of what transpired during BT's cross-examination at Taffner's trial. The jury, without more, had no reason to believe that BT's prior false allegation was attributable to anything more than a misunderstanding. This case turned upon the credibility of witness testimony, and BT's story and credibility were already vulnerable to attack; additional inquiry into the circumstances *448 of BT's past allegations could have made "the difference between conviction and acquittal." Bagley , 473 U.S. at 676, 105 S.Ct. 3375. As such, I feel that the circuit court's restrictions upon BT's cross-examination violated Taffner's right to confront the witnesses presented against him, and that he is thus entitled to a new trial.
Prejudice from the Suppression of Zovak's Testimony
Additionally, I disagree with the majority's assertion that Taffner was not prejudiced by the circuit court's refusal to allow Jonathan Zovak to testify about MG's reputation for untruthfulness in her home community. To support this assertion, the majority opinion hangs its hat on the fact that another one of Taffner's witnesses, Donald "Catfish" Holt, Taffner's neighbor and personal friend, was permitted to testify. Zovak, who had resided in MG's home community for eighteen years and who has never met Taffner, would have testified to MG's reputation for untruthfulness in her home community. As the majority correctly points out, Holt testified that MG was a "schemer" who tried to blame others and get her way, while acting as if she was an innocent child; the majority suggests that this testimony would be "essentially the same" as Zovak's and that Zovak's testimony would thus be cumulative to Holt's.
This is incorrect. Holt offered testimony of his opinion as to MG's untruthfulness, but Zovak would have offered testimony of MG's reputation for untruthfulness in her home community; these are not the same types of evidence and cannot be characterized as cumulative to each other. See Ark. R. Evid. 608(a) ; see also John Wesley Hall, Jr., Trial Handbook for Arkansas Lawyers § 38:1 (18 ed. 2017) (outlining foundational requirements for reputation evidence). Furthermore, Zovak, unlike Holt, has never met Taffner, so Zovak's testimony would not be subject to the same inference of bias that Holt's testimony was. As such, the circuit court's refusal to allow Zovak to testify was plainly prejudicial to Taffner.
Juror Misconduct
Additionally, I reject the majority's intimation that no juror misconduct occurred in this case. Juror Mullins was a court-appointed special advocate ("CASA") in child welfare cases. Mullins could not have become a CASA without swearing an oath before a state circuit judge, and Mullins's responsibilities as a CASA brought her into state circuit courts with regularity-specifically before Judge Zimmerman, the same judge with whom the trial court was engaged in ex parte communications about the DHS File before Taffner's trial. During voir dire, the members of the jury panel were asked whether they had any relationship with the State. Other members of the panel responded that they worked for the Department of Human Services, which required them to appear in state court for child welfare cases, but Mullins remained silent. During the hearing on Taffner's motion for a new trial, Mullins testified that she listened to the questions asked during voir dire "very carefully," and added that she felt the questions were aimed more at determining whether one was an "employee" of the State, as opposed to a CASA, which the circuit court felt would be better characterized as a "volunteer." The circuit court embraced this employee-volunteer distinction and denied Taffner's motion for a new trial.
This is incorrect. Mullins attempted to insulate her failure to disclose her own bias by shifting the blame to Taffner for failing to ask the correct questions to elicit her bias during voir dire. However, the voir dire questions were not tailored only to state employment, but more broadly to *449 any relationship with the State, and Mullins's failure to disclose her relationship with the State was misconduct. As such, Taffner should have been entitled to a new trial if that misconduct resulted in even a "reasonable possibility of prejudice," which it certainly did. See Henderson v. State , 349 Ark. 701, 708, 80 S.W.3d 374, 378 (2002) (citing State v. Cherry , 341 Ark. 924, 20 S.W.3d 354 (2000) ); Dillard v. State , 313 Ark. 439, 855 S.W.2d 909 (1993) ; Larimore v. State , 309 Ark. 414, 833 S.W.2d 358 (1992) (emphasis added). The circuit court's refusal to grant Taffner a new trial on that basis was an abuse of discretion.
Improper Directive to the Circuit Court on Remand
Instead of granting Taffner a new trial, the majority returns Taffner's case to the same trial court that has repeatedly ignored its constitutional obligations so that the trial court may conduct an in camera review of the DHS file, at which point the trial court will only be obligated to grant Taffner a new trial if it discovers "information that (in the opinion of the circuit court) probably would have changed the outcome of the trial. " Majority Opinion, pp. 439 (emphasis added). This is absolutely contrary to the Supreme Court's definition of materiality for purposes of Brady.
The majority cites Ritchie for its proposition that the circuit court need only grant Taffner a new trial if it discovers information in the file that "probably would have changed the outcome of the trial." Ritchie reiterated the Supreme Court's rule that evidence qualifies as "material" for purposes of Brady if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Ritchie , 480 U.S. at 57, 107 S.Ct. 989. I do not dispute that the Ritchie opinion contains one single intimation that the defendant in that case would be entitled to a new trial if, on remand, the trial court determined that the file in question contained information that "probably would have changed the outcome of his [first] trial." Ritchie , 480 U.S. at 58, 107 S.Ct. 989. However, regardless of whether this phrasing could be attributed to the actual legal definition of materiality at the time Ritchie came down, the Supreme Court has since stated, in plain and unambiguous terms, that materiality's "reasonable probability" definition does not mean "more likely than not." Again, seven years after Ritchie , the Supreme Court held:
The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial , understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial.
Kyles , 514 U.S. at 434, 115 S.Ct. 1555 (1995) (emphasis added). One simply cannot argue that the disclosure of the Maltreatment Investigation Reports would not have created, at the very least, a reasonable probability of a different outcome in Taffner's trial. Their suppression does not just undermine confidence in the outcome of Taffner's first trial; it also undermines the public's faith in the judiciary as a general matter.
The cumulative effect of these errors is overwhelming. As such, I would reverse for a new trial.

Justice Baker takes issue with the fact that Taffner never made a formal proffer of the DHS File to the circuit court, as generally required by Rule 103(a)(2). However, "there is no need for a proffer in either of two situations. First, there is no need for a proffer where the substance of the offer was apparent from the context within which the questions were asked. Second, ... Rule 103(a)(2) does not contemplate a proffer of evidence when the information is unavailable to the cross-examiner." Henderson v. State , 279 Ark. 435, 439, 652 S.W.2d 16, 19 (1983). Here, obviously, the DHS File was not available to Taffner for a proffer, and at any rate, Taffner presented the circuit court with enough information to establish that it contained Brady material. As such, Taffner's argument is properly preserved. Acknowledging any argument to the contrary would allow the State to simply refuse to tell the defense the details of any undisclosed Brady material or why any such information could be favorable as a means of insulating that same Brady violation from appellate review.

The Maltreatment Investigation Reports would have involved, at the very least, interviews of:
(1) The child as provided under § 12-18-608;
(2) The parents, both custodial and noncustodial;
(4) Current or past healthcare providers when the allegation of child maltreatment was reported by a healthcare provider; and
(5) Any other relevant persons.
Ark. Code Ann. § 12-18-605(a). The investigators would have had the authority to enter homes and schools, to obtain school, medical, and personnel records, to conduct criminal background checks, to conduct physical examinations, etc. Ark. Code Ann. §§ 12-18-609 through 615. Generally, the Maltreatment Investigation would have sought to ascertain:
(1) The existence, cause, nature, and extent of the child maltreatment;
(2) The existence and extent of previous injuries;
(3) The identity of the person responsible for the child maltreatment;
(4) The names and conditions of other children in the home;
(5) The circumstances of the parents or caretakers of the child;
(6) The environment where the child resides;
(7) The relationship of the child or children with the parents or caretakers; and
(8) All other pertinent data.
Ark. Code Ann. § 12-18-606.

Again, it is not clear what application Rule 613(b) would have in this context. Without the file, Taffner had no way to even know which of BT's statements at trial could be attacked with a prior inconsistent statement. The only legitimate "prior inconsistent statement" Taffner knew of during BT's cross-examination was that which she had given just a few minutes before during her in camera testimony. BT unequivocally admitted during her in camera testimony that her prior allegation had been false, but when asked the same questions in front of the jury, she attributed the prior statement to a lack of understanding. However, Taffner could not even make use of her in camera statement because the circuit court had already told him that he could go no further than the three questions prescribed.