ROBIN F. WYNNE, Associate Justice
Brandon Lacy appeals from an order of the Benton County Circuit Court denying his petition for postconviction relief pursuant to Arkansas Rule of Criminal Procedure 37.5. He argues on appeal that the trial court's decision to deny his petition is clearly erroneous. We affirm in part and reverse and dismiss in part.
Lacy was convicted of capital murder and aggravated robbery and sentenced to death. His convictions were affirmed on direct appeal. Lacy v. State , 2010 Ark. 388, 377 S.W.3d 227 ( Lacy I ). Lacy subsequently filed a petition under Rule 37.5 in which he alleged the following grounds for postconviction relief: 1) defense counsel was constitutionally ineffective for failing to investigate and present the affirmative defense of not guilty by reason of mental disease or defect; 2) defense counsel was constitutionally ineffective for putting before the jury little, if any, mitigation evidence during the penalty phase of the trial; and 3) the cumulative-error rule should be recognized in Arkansas and applied in his case. The trial court denied the petition without a hearing. Lacy appealed, and this court reversed and remanded, holding that Lacy was entitled to an evidentiary hearing. Lacy v. State , 2013 Ark. 34, 425 S.W.3d 746 ( Lacy II ).
After a hearing on the petition was held, the trial court entered an order denying the petition as to the claim that trial counsel was ineffective for failing to present the affirmative defense and granting a new sentencing hearing based on the claim that counsel was ineffective during the penalty phase. The State appealed, and Lacy cross-appealed. This court affirmed the denial of relief on the ground that trial counsel was ineffective for failing to present the affirmative defense of not guilty by reason of mental disease or defect. State v. Lacy , 2016 Ark. 38, 480 S.W.3d 856 ( Lacy III ). We reversed the finding that Lacy had received ineffective assistance during the penalty phase because the finding was based entirely on counsel Steven Harper's subjective assessment of his performance. Id. We reversed and remanded on this point for the trial court to apply an objective legal standard in determining whether Lacy received effective assistance of counsel *749 during the penalty phase.[1] Id. On remand, the circuit court entered an order denying the petition in its entirety. This appeal followed.
We do not reverse the grant or denial of postconviction relief unless the circuit court's findings are clearly erroneous. Sales v. State , 2014 Ark. 384, 441 S.W.3d 883. A finding is clearly erroneous when, although there is evidence to support it, the appellate court, after reviewing the entire evidence, is left with the definite and firm conviction that a mistake has been committed. Id.
We assess the effectiveness of counsel under the two-prong standard set forth by the Supreme Court of the United States in Strickland v. Washington , 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Sartin v. State , 2012 Ark. 155, 400 S.W.3d 694. Under this standard, the petitioner must first show that counsel's performance was deficient. Id. This requires a showing that counsel made errors so serious that counsel deprived the petitioner of the counsel guaranteed to the petitioner by the Sixth Amendment to the United States Constitution. Id. Second, the deficient performance must have resulted in prejudice so pronounced as to have deprived the petitioner a fair trial whose outcome can be relied on as just. Wainwright v. State , 307 Ark. 569, 823 S.W.2d 449 (1992).
There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, and the petitioner has the burden of overcoming that presumption by identifying the acts and omissions of counsel which, when viewed from counsel's perspective at the time of trial, could not have been the result of reasonable professional judgment. Feuget v. State , 2015 Ark. 43, 454 S.W.3d 734. Even if counsel's conduct is shown to be deficient, the judgment will stand unless the petitioner demonstrates that the error had a prejudicial effect on the actual outcome of the proceeding. Id. The petitioner must show that there is a reasonable probability that, but for counsel's errors, the decision reached would have been different. Id. A reasonable probability is one that is sufficient to undermine confidence in the outcome of the trial. Id.
Prior to trial, Lacy was evaluated by Dr. Robin Ross, who indicated that Lacy did not have a mental disease or defect. Lacy's counsel had him evaluated by Dr. Curtis Grundy, who diagnosed him with major depressive disorder and abuse of multiple substances. In his report, Dr. Grundy states that Lacy is able to engage in rational decision making. Trial counsel also consulted with Dr. Robert Forrest, seeking an oral opinion regarding whether Lacy had any brain dysfunction. According to counsel's notes, after reviewing Lacy's records and speaking with Dr. Grundy, Dr. Forrest believed neuropsychological testing was not necessary and that he doubted "very seriously that [neuropsychological] testing would indicate anything significant." Dr. Jack Randall Price, a neuropsychologist retained by the State, echoed Dr. Forrest's opinion at the Rule 37 hearing when he testified that, based on his review of Lacy's records, he did not believe neuropsychological testing was necessary because evidence of a brain injury was not present.
Dr. Bhushan Agharkar, a forensic psychiatrist who examined Lacy as part of the postconviction proceedings, submitted a letter to Lacy's postconviction counsel stating that Lacy exhibited "soft signs" of *750 neurologic damage, particularly organic brain damage. In the letter, Dr. Agharkar states that the findings are preliminary and would require further confirmatory testing. Dr. Agharkar did not testify at the Rule 37 hearing. Dr. Jeff Gould examined Lacy as part of the postconviction proceedings and diagnosed him with depressive disorder, alcohol dependence, and cannabis dependence. These are essentially the same diagnoses as were provided by Dr. Ross and Dr. Grundy.
Dr. Barry Crown, a neuropsychologist retained by Lacy's postconviction counsel, performed a neuropsychological evaluation of Lacy. Dr. Crown found significant neuropsychological impairment impacting multiple functional areas and diagnosed Lacy with cognitive disorder, not otherwise specified. According to Dr. Crown, functional impairments were noticed in the areas of delayed memory, reasoning, judgment, and language-based critical thinking. Dr. Crown testified that he was not provided with any records regarding Lacy and that he considered such to be irrelevant. Dr. Price testified that such records were necessary to deliver opinions with certainty. Dr. Price was critical of the tests given by Dr. Crown, describing them as brief screening tests. According to Dr. Price, there were no clinically significant findings of compromised brain function. He testified that the records and data that he reviewed do not support an opinion that Lacy has brain damage.
Lacy's first argument is that the trial court clearly erred in finding that trial counsel's failure to investigate and present the affirmative defense of not guilty by reason of mental disease or defect was not ineffective assistance of counsel. In Lacy III , this court considered whether the trial court erred in finding that the failure to present the affirmative defense was not ineffective assistance of counsel. We affirmed the finding of the circuit court. This issue was not remanded to the circuit court in that opinion. On remand, a circuit court is vested with jurisdiction only to the extent conferred by our opinion and mandate. Ward v. State , 2017 Ark. 215, 521 S.W.3d 480. Any proceedings on remand that are contrary to the directions contained in the mandate from the appellate court may be considered null and void. Dolphin v. Wilson , 335 Ark. 113, 983 S.W.2d 113 (1998). In Lacy III , our remand was limited to the incorrect standard applied by the trial court to the claim that Lacy received ineffective assistance of counsel during the penalty phase of the trial and the trial court's failure to make the findings required by Rule 37.5. Because the issue of the affirmative defense was not remanded to the trial court in Lacy III , the trial court did not have jurisdiction to consider it on remand. Therefore, we reverse and dismiss as to this issue.
Lacy next argues that the trial court clearly erred in finding that trial counsel's failure to investigate and present mitigation evidence to the jury was not ineffective. Lacy contends his counsel was ineffective for failing to pursue neuropsychological testing and present neuropsychological mitigation evidence to the jury. He further contends that, if counsel had done so, members of the jury potentially would have found as mitigating circumstances that he suffered from extreme emotional or mental disturbance and may also have found that he was impaired by mental disease.
As recounted above, neither the report from Dr. Ross nor the report from Dr. Grundy indicate that Lacy suffered from any mental disease or neurological deficits. Dr. Grundy did suggest to counsel that a neuropsychological consult might be needed. According to Dr. Grundy's testimony at *751 the Rule 37 hearing, this is what led counsel to consult with Dr. Forrest. Dr. Forrest indicated that he did not believe neuropsychological testing would be beneficial. Far from ignoring the issue of neuropsychological testing, counsel explored it and was told by an independent expert that it was not needed. This conclusion was repeated during the Rule 37 proceeding by Dr. Price, who testified that he saw no indication of brain damage and was highly critical of the conclusions reached by Dr. Crown. Given the information that counsel had at the time of trial, as well as the other evidence in the record, we affirm the denial of relief on the claim that counsel failed to adequately investigate Lacy's alleged neuropsychological issues.
Lacy argues that the trial court erred by ignoring the testimony of Dr. Crown and relying on the testimony by Dr. Price. Lacy mischaracterizes the trial court's order. In its order, the trial court does not ignore Dr. Crown's testimony. Instead, it explains why it credits Dr. Price's testimony over that by Dr. Crown. As we noted in Lacy III , the trial court was entitled to give more weight to the criticism by Dr. Price in its order. 2016 Ark. 38, at 8, 480 S.W.3d at 861. We see no error by the trial court on this point.
Lacy next argues that counsel erred by relying exclusively on testimony by family members and failing to call expert witnesses during the sentencing phase. He contends that counsel was aware that the family members were unreliable witnesses and that expert testimony was necessary to explore Lacy's substance-abuse problems in greater detail. Generally, the decision to call a witness is a matter of trial strategy. See Stiggers v. State , 2014 Ark. 184, 433 S.W.3d 252. In his petition, Lacy faults trial counsel for failing to explore the information contained in the reports by Dr. Donnie Holden[2] and Dr. Grundy during sentencing. Trial counsel attempted to secure Dr. Holden to testify, but was unable to do so. Trial counsel also attempted to introduce Dr. Holden's report but was unsuccessful in that effort as well. Counsel made a strategic decision not to call Dr. Grundy during sentencing out of concern that information elicited from Dr. Grundy on cross-examination could damage Lacy's efforts at mitigation. Dr. Grundy potentially would have been subject to cross-examination regarding statements Lacy made to him about other crimes he remembered committing as well as statements about the crime for which he was convicted that would have been damaging to Lacy's mitigation efforts. Considering this, we hold that the trial court did not err in finding that the decision not to call Dr. Grundy was a matter of trial strategy and did not constitute ineffective assistance of counsel.
Regarding the decision to call the family members, counsel elected to rely on testimony from family because they would be less susceptible to damaging cross-examination. The family members who testified spoke to Lacy's history of substance abuse as well as his troubled upbringing. At least one juror found that several different mitigators existed regarding Lacy's history of drug and alcohol abuse, so clearly the evidence was put before the jury by trial counsel. Lacy contends that the family members who testified were unprepared; we agree with the trial court's conclusion that this is not borne out by the record. As the trial court notes in its order, trial counsel was more *752 effective in eliciting information from the family members than postconviction counsel, as postconviction counsel was unable to elicit testimony that was submitted at trial regarding abuse Lacy was subjected to as a child. We see no error by the trial court on this point.
Lacy next argues that Steven Harper's closing argument was ineffective. The State responds that this argument cannot be considered on appeal because it was not raised in the Rule 37 petition. Lacy counters that the issue was clearly argued at the hearing and referenced by this court in Lacy III , resulting in it being ripe for review. We conclude that the trial court's conclusion that Harper's performance at trial was not deficient is not clearly erroneous. Although Harper referred to the closing argument as one of the worst he had ever given, a review of the closing reveals that he made strenuous efforts to convince the jury to impose a life sentence as opposed to the death penalty. The jury elected to impose the death penalty despite his efforts.
Finally, Lacy contends that cumulative errors by trial counsel warrant a determination that his trial counsel was ineffective. This court does not recognize cumulative error in allegations of ineffective assistance of counsel. Noel v. State , 342 Ark. 35, 26 S.W.3d 123 (2000). Lacy admits this, but asks us to overrule our precedent, contending that it would bring us into conformity with the majority of jurisdictions across the nation. A party asking this court to overrule a prior decision has the burden of showing that the refusal to overrule the prior decision would result in injustice or great injury. Houghton v. State , 2015 Ark. 252, 464 S.W.3d 922. Lacy has not demonstrated that his counsel committed any errors during the penalty phase, much less that an accumulation of error should result in his receiving a new sentencing hearing. We decline Lacy's invitation to overrule our prior decisions regarding the cumulative-error doctrine.
Affirmed in part; reversed and dismissed in part.
Hart, J., dissents.
Josephine Linker Hart, Justice, dissenting.
I dissent. Lacy's trial counsel was deficient for failing to adequately investigate a viable path for Lacy's defense, his mental-health condition. This inadequate investigation was prejudicial to Lacy because the jury, which convicted Lacy and sentenced him to death, never received any of the information that could have and should have been discovered through counsel's investigation. In light of the standard set forth in Strickland v. Washington , 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), as well as the American Bar Association Guidelines, Lacy did not receive effective assistance of counsel. Effective counsel would have obtained and presented this evidence to the jury. Had he done so, the jury's decision may very well have been different. Accordingly, we should remand this case to the circuit court for further proceedings.
Per Strickland , we look to the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (ABA Guidelines) for assistance in determining whether counsel's representation meets the deficiency requirement. 466 U.S. 668, 688-89, 104 S.Ct. 2052, 80 L.Ed.2d 674. The ABA Guidelines provide that defense counsel in a capital case must investigate possible affirmative defenses, *753 such as insanity.[3] Furthermore, the ABA Guidelines provide that "[t]he mitigation investigation should begin as quickly as possible, because it may affect the investigation of first phase defenses [and] decisions about the need for expert evaluations."[4]
With particular application to this case, the ABA Guidelines on capital defense also provide:
Counsel must compile extensive historical data, as well as obtain a thorough physical and neurological examination. Diagnostic studies, neuropsychological testing , appropriate brain scans , blood tests or genetic studies, and consultation with additional mental health specialists may also be necessary.[5]
The ABA Guideline commentary specifically provides that defense counsel "needs to explore" medical history, including "neurological damage."[6] Further, counsel should "remain current on developments in fields such as neurology and psychology...."[7] In 2008, the ABA supplemented the ABA Guidelines, adding the following to its guidelines for capital defense:
At least one member of the team must have specialized training in identifying, documenting and interpreting symptoms of mental and behavioral impairment, including cognitive defects , mental illness, developmental disability, neurological deficits , long-term consequences of deprivation, neglect and maltreatment during developmental years; social, cultural, historical, political, religious, racial, environmental and ethnic influences on behavior; effects of substance abuse and the presence, severity and consequences of exposure to trauma. Team members acquire knowledge,
experience, and skills in these areas through education, professional training and properly supervised experience.[8 ]
When we apply Strickland 's standard of objective reasonableness and consider the guidance from the ABA Guidelines, it should be plain that Lacy's trial counsel was deficient for his failure to obtain neuropsychological testing for his client. In this case, there were numerous circumstances indicating that it was both appropriate and necessary to obtain an assessment of Lacy's neurological status. Although Lacy confessed to these crimes shortly after the police first made contact with him, it quickly became apparent that Lacy may or may not have had actual independent memories of the facts to which he had confessed. It was suspected that Lacy suffered from an amnesia-related condition known as memory confabulation, potentially stemming from Lacy's alcohol abuse.
The investigation that was conducted revealed, among other things, that Lacy's mother had left him in the care of strangers when he was just a few months old, which resulted in her losing custody of *754 Lacy; that Lacy was a long-time daily blackout drinker who began consuming alcohol regularly at the age of ten; that Lacy began regularly huffing and using harmful narcotics at age fifteen; that Lacy "got [physically] beat up on most of his life"; and that Lacy had a brick smashed over his head and suffered other serious head trauma many years before his arrest. Lacy's head injuries resulted in his hospitalization and left him with a large scar stretching across the right side of his head through the temple, as well as other smaller scars.
I disagree with the majority's characterization of Lacy's trial counsel's investigation of his client's mental-health status. While Dr. Grundy, who examined Lacy after the memory-confabulation concerns first arose, did opine that Lacy was competent for purposes of standing trial, he nonetheless instructed Lacy's trial counsel to consult with Dr. Hall at the University of Hawaii about the specifics of Lacy's mental-health situation. Dr. Grundy, who is not a neuropsychologist, did not give Lacy's trial counsel these instructions to have Dr. Hall himself testify on Lacy's behalf. Dr. Grundy made this recommendation specifically so that Dr. Hall could refer Lacy's trial counsel to the correct specialists to properly address Lacy's particular mental-health conditions and symptoms, which in this case would have been a neuropsychological specialist. Lacy's trial counsel never contacted Dr. Hall or consulted with any neuropsychological specialist.
Counsel's failure to obtain neuropsychological testing was not attributable to any reasonable defense strategy, but to counsel's simple lack of diligence and attention. At Lacy's Rule 37 hearing, Lacy's trial counsel himself acknowledged that the "attitude" before trial was that the prosecution would come forward with an acceptable plea offer that would render Lacy's trial unnecessary. He testified that he was more focused on another capital case he was working on during the same time period that was believed to be "a lot more important," and stated flatly, "I don't think I was prepared when I came into this trial ... [We thought,] 'no one is going to give [Lacy] the death penalty,' and no, we weren't prepared, no." Lacy's trial counsel rated his own representation of Lacy as a 1.5 out of 10. The executive director for the Capital Conflict Office removed Lacy's trial counsel from all capital cases after Lacy's trial, and the trial judge herself referred Lacy's trial counsel to the Arkansas Office of Professional Conduct after Lacy's Rule 37 hearing.
This failure to investigate was prejudicial to Lacy. When Lacy finally did receive the appropriate examinations from actual neuropsychological specialists after he had already been sentenced to death , those examining physicians found that Lacy suffered from organic brain damage of the sort that would have affected his level of guilt and culpability for the charged offenses.
On November 3, 2011, before filing his Rule 37 petition, Lacy was interviewed by Dr. Bhushan Agharkar, a forensic psychiatrist. Dr. Agharkar opined that Lacy "exhibits 'soft signs' of neurologic damage, particularly organic brain damage," though he added that his findings were "preliminary at this point and require further confirmatory testing." A month after Dr. Agharkar's examination of Lacy, Lacy was subjected to dozens of in-depth neuropsychological evaluations by Dr. Barry Crown at the Varner Unit in December 2011. Dr. Crown's evaluation reports concluded that Lacy has "a significant neuropsychological impairment impacting multiple functional areas," including "delayed memory, reasoning, judgment, and language-based critical *755 thinking"; that Lacy has "a significantly impaired RBANS profile" of the sort that "is clearly consistent with organic brain damage"; that "the voluntariness of his intoxication episodes is brought into question due to his brain damage"; that "it is likely that a significant portion of his brain damage occurred during childhood and early adolescence"; and that Lacy's conditions "could only have been worse pre-trial and at the trial period." Indeed, this evidence would have been paramount to Lacy's defense. Lacy has established Strickland 's prejudice requirement. The jury never heard any evidence about Lacy's brain damage.
Furthermore, it was wholly inappropriate for the circuit court to usurp the role of the jury in determining whether this evidence was credible and the weight to be assigned to it. The relevant question was not whether the circuit court at Lacy's Rule 37 hearing believed Dr. Price's testimony over Dr. Crown's, but whether the fact that none of this evidence was ever presented to the jury undermines confidence in its decision. Strickland , 466 U.S. at 687-88, 104 S.Ct. 2052. Plainly, it does. The jury was deprived of any information about Lacy's organic brain damage and how it could have impacted his level of guilt or culpability before they sentenced him to death. The prejudice resulting from Lacy's trial counsel's inadequate investigation is obvious and undeniable.
I would reverse.

The trial court was also ordered on remand to make specific written findings regarding each issue raised in the petition, in compliance with Rule 37.5(i).

According to the petition, Dr. Holden had diagnosed Lacy with alcohol amnestic disorder in 2005 following a suicide attempt.

ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 1.1.G cmt. (2003), http://ambar.org/2003Guidelines.

Id. § 10.7 cmt.

Id. § 4.1 cmt. (emphases added) (citing Douglas S. Liebert, Ph.D., and David V. Foster, M.D., The Mental Health Evaluation in Capital Cases: Standards of Practice , 15:4 Am. J. Forensic Psychiatry, 43-64 (1994) ).

Id. § 10.7 cmt.

Id. § 10.11 cmt.

Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases § 5.1(E) (2008) (emphases added), https://www.americanbar.org/content/dam/aba/migrated/2011_build/death_penalty_representation/2008_july_cc1_guidelines.authcheckdam.pdf.